2019 IL App (4th) 170165

NO. 4-17-0165

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
May 31, 2019
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | McLean County |
| ALFREDO ALBERTO GARZA, | ) | No. 14CF923 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Scott D. Drazewski, |
| | ) | Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court, with opinion.
Justices Steigmann and Knecht concurred in the judgment and opinion.

**OPINION**

¶ 1    Following a bench trial, defendant, Alfredo Alberto Garza, was convicted of

escape (720 ILCS 5/31-6(c) (West 2014)). The trial court sentenced him to six years in prison.

On appeal, defendant argues that the State failed to prove he was in "lawful custody," an element

of the offense of escape. We disagree and affirm the court's judgment.

¶ 2                                I. BACKGROUND

¶ 3    In August 2014, defendant was charged with escape, a Class 2 felony (count I)

(*id.*), and resisting a peace officer, a Class A misdemeanor (count II) (*id.* § 31-1(a)).

¶ 4    At a bench trial in December 2016, Ellsworth police officer Joshua Dingler

testified that on August 9, 2014, he arrived at defendant's residence with the Ellsworth Chief of

Police Steve Silvey, in response to a complaint of barking dogs. Officer Dingler explained that,

en route, they learned there was an outstanding warrant for defendant's arrest for an unrelated felony offense.

¶ 5       Officer Dingler testified that he knocked on the door of the residence, and defendant's girlfriend, Tavia Betts, allowed the officers to enter. Upon entering the residence, Officer Dingler observed defendant standing at the top of a stairwell, wearing only sweatpants. Officer Dingler advised defendant that there was a warrant for his arrest. Officer Dingler proceeded to walk upstairs and informed defendant "that he was under arrest." Defendant then requested that he be allowed to put on a shirt and shoes and to say goodbye to his family. Officer Dingler "escorted" defendant into his bedroom while defendant dressed. During this time, Officer Dingler stayed within two feet of defendant. Defendant was permitted to say goodbye to his son, who was in another upstairs bedroom. Again, Officer Dingler stayed within two feet of defendant. Officer Dingler testified that he informed defendant that he would not be handcuffed in front of his children, but that once they were outside, he would be handcuffed for transportation. Defendant was "escorted" down the stairwell as Officer Dingler walked "very closely right behind," with Chief Silvey "downstairs waiting for [defendant]."

¶ 6       Officer Dingler further testified that, after defendant said goodbye to his girlfriend and his daughter downstairs, he and Chief Silvey "escorted" defendant outside. "[W]hen [we] got to the door *** [we] [e]ach *** had an arm." However, because the door was too "skinny," defendant walked outside first with the officers following behind him. Defendant asked if he could smoke a cigarette before he was put in handcuffs. Defendant was allowed to do so with the "caveat" that "after he lit his cigarette, he was going to have to be placed in handcuffs." When defendant lit his cigarette, Officer Dingler told defendant to turn around and place his hands

behind his back. Defendant responded, "[A]ll right." Then he "turned" and "took off running." Officer Dingler chased defendant and apprehended him several blocks away.

¶ 7 The State rested, and the trial court denied defendant's motion for a directed verdict.

¶ 8 Defendant's girlfriend, Tavia Betts, testified next. Betts testified that, when the officers arrived at the house, she initially told them defendant was not home, but eventually she acknowledged he was present. Betts testified she never observed the officers "exercise any physical control" over defendant. However, she admitted there were "parts of the situation between the officers and *** defendant that [she] did not see."

¶ 9 Blaze Garza, defendant's son, who was 16 years old at the time of trial, testified that, on the date in question, he was asleep in an upstairs bedroom. He stated that he was awakened that morning by his father who came into his bedroom to say he loved him and they hugged. There was an officer standing behind defendant at the time. Blaze testified that he did not "see the officer[ ] holding [defendant] in any way."

¶ 10 John Schneider, defendant's neighbor, testified that he was across the street doing home repairs outside when he saw officers pull up to defendant's home. Schneider stated the officers were inside the house for 10 or 15 minutes before defendant came outside. Schneider stated that officers were not "holding" defendant "at that time." Schneider further testified that defendant "took off" running, and officers later returned to the house with defendant in handcuffs.

¶ 11 Defendant testified on his own behalf. He stated that the officers "never once touched me the whole time." Before he went outside with the officers, defendant "grabbed a

shirt" and told his family he "loved" them. Defendant then noticed a pack of cigarettes and said, "Oh, I'm gonna smoke a cigarette." Defendant explained that he did not smoke inside his house and one of the officers said, "Well, go outside." Defendant testified that he went outside, and the officers "c[a]me out" "behind" him. Defendant explained that he became "frustrated" as he smoked. He testified that he "jumped" but "stopped when [an officer] told [him] to stop."

¶ 12    The trial court found defendant guilty of both escape (count I) and resisting a peace officer (count II). As to count I, the court concluded that defendant was in custody within the meaning of the escape statute because the officers exercised physical control over him.

¶ 13    Defendant subsequently filed a motion for reconsideration. In February 2017, the trial court granted the motion in part and vacated defendant's conviction for resisting a peace officer (count II). That same day, the court sentenced defendant to six years in prison on count I.

¶ 14    This appeal followed.

¶ 15                                    II. ANALYSIS

¶ 16    Defendant argues on appeal that the State failed to prove he was in "lawful custody," an element of the offense of escape. Defendant contends the issue involves a matter of statutory construction for which the proper standard of review is *de novo*. The State maintains that defendant is challenging the sufficiency of the evidence and, thus, the standard of review is "whether, when viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the elements of the crime beyond a reasonable doubt." *People v. McClanahan*, 2011 IL App (3d) 090824, ¶ 10, 978 N.E.2d 642.

¶ 17    Initially, we note that the State has presented sufficient evidence to support defendant's conviction under either standard. See *People v. Johnson*, 396 Ill. App. 3d 1028,

–4–

1030, 920 N.E.2d 1212 (2009). Further, we find this case to be similar to *McClanahan*, 2011 IL App (3d) 090824, which also involved the issue of whether a defendant was in "lawful custody" for purposes of the escape statute. In determining the appropriate standard of review, the *McClanahan* court stated:

> "We do not find that this case involves a matter of statutory interpretation. Instead, the defendant's conviction is dependent upon whether the officer exercised a sufficient amount of control over the defendant. [Citation.] We will, therefore, uphold the conviction if any rational trier of fact could have found that the defendant was in lawful custody." *Id.* ¶ 11.

We find the approach taken in *McClanahan* was proper and decline to apply a *de novo* standard of review.

¶ 18    The escape statute provides, in pertinent part, that "[a] person in the lawful custody of a peace officer for the alleged commission of a felony offense *** and who intentionally escapes from custody commits a Class 2 felony." 720 ILCS 5/31-6(c) (West 2014). The term "lawful custody" is not defined by the statute. Nor is the term defined elsewhere by the legislature. Generally, for purposes of interpreting the escape statute, "Illinois courts have focused on the amount of control the officer had over the defendant" (*McClanahan*, 2011 IL App (3d) 090824, ¶ 12) and the "restriction of defendant's freedom of movement" (*Johnson*, 396 Ill. App. 3d at 1032).

¶ 19    Defendant cites *People v. Kosyla*, 143 Ill. App. 3d 937, 494 N.E.2d 945 (1986), to support his argument that the officers in the instant case did not exercise control over him. In *Kosyla*, officers told the defendant that he was under arrest but did not make physical contact or

–5–

otherwise restrain his freedom of movement. When an officer told the defendant he was under arrest, the defendant said he was going to call his lawyer, and he went back inside his home. *Id.* at 940. The defendant subsequently came outside again and said, " '[i]f you want me, come get me.' " *Id.* at 952. The defendant then ran toward a cornfield behind his home. *Id.* at 940. On appeal, the court concluded that the defendant was not in "custody" for purposes of the escape statute. *Id.* at 951. The court emphasized that the defendant taunted the officer by saying, " '[i]f you want me, come get me,' " and found that this "clearly evidenced [the defendant's] intent to evade the imposition of custody altogether, not to escape from it." *Id.* at 952.

¶ 20　　　　The State contends the instant case is more similar to *People v. Lauer*, 273 Ill. App. 3d 469, 653 N.E.2d 30 (1995), and *McClanahan*. In *Lauer*, officers informed the defendant that there had been reports of a loud party in his driveway. *Id.* at 471. An argument ensued, and the defendant kicked one of the officers. *Id.* When another officer tried to handcuff the defendant, he "broke away" and "ran into the house." *Id.* After following the defendant inside, one officer "put his arm around [the] defendant's neck" and "pulled [the defendant] backwards from the back bedroom toward the front door." *Id.* The defendant "broke free" again and "ran" away. *Id.* In affirming the defendant's conviction for escape, the court stated that the officer "did more than merely announce that [the] defendant was under arrest." *Id.* at 474. The defendant was "actually restrained" and "physically moved" from the "back bedroom to the front part of the house" prior to running away from the officers. *Id.*

¶ 21　　　　In *McClanahan*, 2011 IL App (3d) 090824, ¶ 5, an officer informed the defendant that he was under arrest and "grabbed" him, forcing him onto the hood of a car. As the officer reached for handcuffs, the defendant "slip[ped] away" and " 'took off running.' " *Id.* On appeal,

the defendant argued that he was "never in lawful custody" because the officer "failed to acquire sufficient control" over him. *Id.* ¶ 9. The court found that the defendant was in custody because the officer "did more than inform defendant that he was under arrest" and "physically restrained" him. *Id.* ¶¶ 16, 18.

¶ 22　　　　In this case, like *Lauer* and *McClanahan*, the officers did more than merely announce to defendant that he was under arrest. Officer Dingler testified that he stood "within two feet" of defendant and "escorted" him throughout the house after defendant was given permission to put on his clothing and say goodbye to his family. Further, the officers exercised control over defendant by "escort[ing]" him down a staircase, with one officer following "very closely right behind" and the other officer "downstairs waiting for [defendant]." The officers physically escorted defendant to the door, with each of them holding on to one of defendant's arms. In fact, the following colloquy during Officer Dingler's cross-examination makes clear that the officers were in physical control of defendant as they walked with him toward the door:

"Q. And you never physically restrained [defendant] before he took off running?

A. Define restraining.

Q. Restraining, holding. Holding him still[.]

A. We did hold him as we walked him to the door."

¶ 23　　　　Based on this evidence, we find that defendant was in "lawful custody" within the meaning of the escape statute. See 720 ILCS 5/31-6(c) (West 2014).

¶ 24　　　　In closing, we commend the police officers here for the considerate manner in which they placed defendant in custody. Their actions inside defendant's home, including

allowing defendant to dress and say goodbye to his son without being handcuffed, likely served to limit the family's trauma attendant to the circumstances.

¶ 25                                    III. CONCLUSION

¶ 26         For the reasons stated, we affirm the trial court's judgment. As part of our judgment, we award the State its $75 statutory assessment against defendant as costs of this appeal. 55 ILCS 5/4-2002(a) (West 2016).

¶ 27         Affirmed.