Rule 23 order filed
December 1, 2020.
Motion to publish granted
December 21, 2020.

2020 IL App (5th) 170481

NO. 5-17-0481

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Union County. |
| | ) | |
| v. | ) | No. 15-CM-146 |
| | ) | |
| RODERICK L. HILEMAN, | ) | Honorable |
| | ) | Charles C. Cavaness, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE WHARTON delivered the judgment of the court, with opinion.
Justices Cates and Barberis concurred in the judgment and opinion.

**OPINION**

¶ 1    The defendant, Roderick L. Hileman, was convicted of one count of escape (720 ILCS 5/31-6(c) (West 2014)), three counts of obstruction of a peace officer (*id.* § 31-1(a)), and one count of aggravated assault (*id.* § 12-2(b)(4)(i)). The defendant appeals his conviction for escape, arguing that the evidence was insufficient to prove beyond a reasonable doubt that he was in lawful custody, an element of the offense. He appeals all of his convictions, arguing that the court's failure to fully comply with Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) constituted plain error. Finally, he appeals his sentence for aggravated assault, arguing that the court impermissibly considered a factor inherent in the offense—the threat of harm—as an aggravating factor. We affirm.

1

¶ 2                                    I. BACKGROUND

¶ 3    On July 20, 2015, Officer Josh Ehler encountered the defendant in the parking lot of the Blue Fish Liquor Store in Anna, Illinois. At the defendant's trial in this matter, Officer Ehler testified that he was on patrol some time after midnight when he noticed an individual sitting on some rocks at the edge of the parking lot of Blue Fish Liquor. The individual, who was later identified as the defendant, was holding what appeared to be a beer can. Because consumption of alcohol in public violates an Anna city ordinance, Officer Ehler pulled into the parking lot, approached the defendant, and spoke to him through the open window of his squad car.

¶ 4    According to Officer Ehler, the defendant appeared to be intoxicated. When Officer Ehler asked the defendant about the beer can, the defendant told him he was old enough to drink. Officer Ehler explained that a local ordinance prohibited him from having an open container in public. He testified that the defendant approached the vehicle, leaned into the window, and cursed at Officer Ehler. Officer Ehler drove his vehicle to another part of the parking lot and called dispatch to request back-up.

¶ 5    Officer Ehler testified that he then approached the defendant once again. This time, he got out of his vehicle. He asked the defendant for identification because it was police protocol to do so. The defendant took out his wallet and began "fumbling" through it, but he did not produce an identification card. While this was taking place, Officer Leek pulled into the parking lot.

¶ 6    Officer Ehler testified that the defendant told him to take his badge off and said he would "beat [his] fucking ass." Officer Ehler interpreted this as "an aggressive threat." He then took out a pair of handcuffs and told the defendant to place his arms behind his back because he was under arrest. The defendant did not comply. Instead, he "took an aggressive stance." Officer Ehler stated that he reached out, grabbed the defendant's left arm, and pulled his hand behind his back. He

2

testified, "I attempted to walk him towards my patrol car in order to place him against it to try to gain control over the suspect." At this point, Officer Leek grabbed the defendant's right arm "to help gain control." Asked if this meant that the defendant "was walking towards the car" with both officers, he replied, "Yes."

¶ 7       Officer Ehler testified that the defendant pulled both of his arms free from the officers' grip and then "took off running." Officer Ehler yelled to him twice, directing him to stop; however, the defendant continued running. The officers ran after the defendant, who ran towards Vienna Street. Based on the defendant's verbal threat and resistance to arrest, Officer Ehler believed that he may have committed a crime. As such, he explained, he did not want to let the defendant "run off into the night." He therefore used his TASER on the defendant. The defendant, who was running at full speed, tensed up and fell forward. Officer Ehler explained that when a TASER is used on a suspect, it "locks all the muscles up." As such, the defendant was unable to put his hands out to brace himself when he fell.

¶ 8       According to Officer Ehler, when he and Officer Leek approached the defendant, they noticed that he was unconscious and that his face was bleeding. Officer Leek handcuffed the defendant and called for an ambulance. According to Officer Ehler, the defendant regained consciousness before the ambulance arrived a few minutes later.

¶ 9       On cross-examination, Officer Ehler testified that he placed the defendant under arrest because he believed he was in danger of receiving a battery due to the defendant's threat. He acknowledged, however, that the defendant did nothing other than threaten him verbally. Officer Ehler further testified that the emergency room physician who treated the defendant told him that the defendant's injuries were minor and would heal on their own. When shown photographs of the defendant's injuries, however, Officer Ehler acknowledged that there were injuries on both sides

3

of the defendant's face. He denied that these injuries resulted from a beating by police. When asked by defense counsel whether his police report was "almost a duplicate" of Officer Leek's report, Officer Ehler acknowledged that it was. However, he denied that he and Officer Leek discussed the matter and "came up with a story"; rather, he testified that the reports were nearly identical "because that's what happened."

¶ 10　Defense counsel asked, "Did you ever have him in custody and control?" Officer Ehler replied, "He was not physically in custody." On redirect examination, Officer Ehler testified that the defendant was "never physically put into custody" and was "never transported to the jail."

¶ 11　Officer Leek testified that he drove past the Blue Fish Liquor Store while on patrol that night and noticed Officer Ehler's patrol car in the parking lot. He did not see anyone else in the parking lot. However, as he drove past, he heard over his radio that Officer Ehler had requested back-up to assist him with a "combative male subject." Officer Leek turned his vehicle around and pulled into the parking lot. As he did, he saw Officer Ehler exiting his squad car and approaching an individual, who he recognized as the defendant.

¶ 12　According to Officer Leek, he told the defendant to cooperate with Officer Ehler because it would "make this much easier and smoother." However, the defendant did not acknowledge Leek or look at him. Instead, he continued to be "uncooperative" and "argumentative" towards Officer Ehler. Officer Leek testified that the defendant said to Officer Ehler, "Take that badge off and I'll beat your ass."

¶ 13　Officer Leek's account of the events that followed was consistent with Officer Ehler's account. He gave a somewhat more detailed description of the "aggressive stance" taken by the defendant. He explained that the defendant "bladed his body" towards Officer Ehler. Asked to explain what he meant by "bladed," Officer Leek responded, "It's more of a defensive stance more

4

or less, *** kind of sideways as if maybe you might want to throw a punch or possibly reach for a weapon or something."

¶ 14　On cross-examination, defense counsel questioned Officer Leek about the similarity in the wording in portions of the two officers' police reports. The following exchange took place:

"Q. So the fact that some of this wording is identical is just a coincidence?

A. Is that a question?

Q. Yeah.

A. I guess."

We note that the police reports were not admitted into evidence. Counsel next showed Officer Leek photographs of the injuries to the defendant's face, which, as we noted earlier, showed that he received injuries to both sides of his face. Counsel asked if the defendant received these injuries from landing on the sidewalk on one side of his face. Officer Leek replied, "Yes, he was running at a full speed."

¶ 15　Officer Leek's testimony concerning what transpired after Officer Ehler used his TASER differed somewhat from that of Officer Ehler. He testified that the barbs from the TASER must have made contact with the defendant's body, explaining that, otherwise, he would not have tensed up and fallen forward as he did. Officer Ehler, by contrast, testified that because the barbs fired from a TASER exude an electrical charge, the defendant could have been affected even if they did not make physical contact.

¶ 16　Dr. Madlene Buggs was the defendant's treating physician in the emergency room. She testified that the defendant sustained multiple injuries to his head and face. He sustained multiple fractures to facial bones as well as abrasions on both sides of his face. In addition, the defendant experienced a decrease in his ability to communicate. Dr. Buggs testified that he had to be

5

transported to a trauma center for further treatment of his injuries. She testified that she did not observe any indication that the defendant's body was pierced by the barb from a TASER; however, she also testified that she did not frequently see patients after a TASER was used on them.

¶ 17    When asked if the defendant's injuries were likely caused by something other than a fall to the pavement, Dr. Buggs opined that while it was not impossible for him to receive such injuries from a single fall to the pavement, they were more likely to have resulted from either multiple falls or from being struck multiple times with an object. This was so, she explained, because he sustained significant injuries, including fractures on both sides of his face.

¶ 18    Dr. Buggs further testified that she did not tell the investigating officer that the defendant's wounds would heal on their own. She acknowledged that she did not remember her conversation with the officer. She stated, however, that she would not have told him that the injuries would heal on their own, noting, "obviously, we had to transfer him to a trauma center, and that would mean that it wouldn't heal on its own."

¶ 19    On cross-examination, Dr. Buggs acknowledged that a nurse who examined the defendant made a notation in his medical record indicating that his facial injuries looked like "road rash." She also acknowledged that it was not impossible for the defendant to have sustained the injuries he did from a single fall. She testified that the defendant reported being intoxicated and that he had a blood alcohol content of .129.

¶ 20    During closing argument, the defendant argued that the only credible witness was Dr. Buggs. He argued that the defendant's injuries were caused by being beaten with a blunt object by Officer Ehler, and that Officer Leek arrived on the scene after the beating was over. The jury returned verdicts of guilty on all five charges; however, the court noted that one of the obstruction of a peace officer charges merged with the escape charge.

¶ 21    Subsequently, the State filed a sentencing memorandum with the court. The State argued that three factors in aggravation were applicable—the defendant's conduct threatened serious harm (see 730 ILCS 5/5-5-3.2(a)(1) (West 2014)), he had a lengthy history of prior crimes (see *id*. § 5-5-3.2(a)(3)), and a jail sentence was necessary to deter others (see *id*. § 5-5-3.2(a)(7)). In support of its contention that the defendant's conduct threatened serious harm, the State asserted that his "direct actions were to threaten Officer Josh Ehler with bodily harm." The State further asserted that "[t]he defendant then blindly ran down East Vienna Street, causing two officers to have to pursue him into the street." In support of its argument that the defendant had a lengthy criminal history, the State attached copies of dispositions for 31 previous charges. The State requested that the defendant be sentenced to 364 days in jail and 24 months of conditional discharge.

¶ 22    At the sentencing hearing, the State repeated the arguments it made in its memorandum. The defendant presented the testimony of his mother concerning the severity of his injuries. She also testified that she relied on the defendant for financial assistance and for help maintaining her home and running her farm. He argued that there were three applicable factors in mitigation— there were "substantial grounds tending to excuse or justify the defendant's criminal conduct, though failing to establish a defense" (see *id*. § 5-5-3.1(a)(4)), a jail sentence would cause hardship to his mother (see *id*. § 5-5-3.1(a)(11)), and a jail sentence would endanger his medical condition (see *id*. § 5-5-3.1(a)(12)).

¶ 23    In ruling from the bench, the court found that no factors in mitigation were applicable and that all three factors in aggravation relied upon by the State were present. Although the court found that the defendant's conduct threatened serious harm, the court noted that there was no evidence that the defendant attempted to injure either of the officers. The court sentenced the defendant to 18 months of probation. As a condition of his probation, the court ordered the defendant to submit

7

to an alcohol evaluation and an anger management evaluation, to complete any treatment recommended in these evaluations, and to submit to random drug and alcohol screenings. The court further ordered that for the first 12 months of his probation, the defendant would be subject to home confinement from 9 p.m. to 6 a.m. each night. However, the court noted that if the defendant was successful in his treatment programs, he could petition the court to lift this condition. The court also imposed fines, which are not at issue in this appeal. This appeal followed.

¶ 24                                    II. ANALYSIS

¶ 25                    A. Sufficiency of the Evidence on the Escape Charge

¶ 26    The defendant first argues that there was insufficient evidence to prove  him guilty of escape beyond a reasonable doubt because there was no evidence that he was ever in "lawful custody" within the meaning of the statute defining the offense. That statute provides, in relevant part, that a "person in the lawful custody of a peace officer for the alleged commission of a misdemeanor offense *** who intentionally escapes from custody commits a Class A misdemeanor." 720 ILCS 5/31-6(c) (West 2014). The defendant contends that there was no evidence that the officers exercised sufficient control over him to constitute custody. We disagree.

¶ 27    Ordinarily, we review challenges to the sufficiency of the evidence to determine whether, viewing all the evidence in the light most favorable to the State, any reasonable trier of fact could have found all the essential elements of the offense beyond a reasonable doubt. *People v. Collins*, 106 Ill. 2d 237, 261 (1985). The defendant argues, however, that our review should be *de novo* because his argument focuses on the meaning of the statutory term "lawful custody." He points out that statutory construction is an issue of law subject to *de novo* review. See *People v. Alcozer*, 241 Ill. 2d 248, 254 (2011). Two districts of the Illinois Appellate Court have already rejected this argument. Both the Third District and the Fourth District found that whether a defendant was "in

8

lawful custody" depends on the factual question of whether the officers involved exercise a sufficient degree of control over the defendant. *People v. Garza*, 2019 IL App (4th) 170165, ¶ 17; *People v. McClanahan*, 2011 IL App (3d) 090824, ¶ 11. In this case, however, we believe the defendant's claim fails under either standard of review.

¶ 28 The defendant calls our attention to the case of *People v. Kosyla*, 143 Ill. App. 3d 937 (1986). There, police officers went to the home of the defendant and his wife in response to a complaint about loud music from a stereo in their garage. *Id.* at 939. When one of the officers told the defendant to turn down the volume because it was disturbing the neighbors, he instead turned the volume louder and asked the officer, " 'What are you going to do, arrest me?' " *Id*. at 940. The officer informed the defendant that he was under arrest. The defendant stated that he was going to call his attorney, and he went into his house. *Id*. After the defendant's wife and son—who were also arrested in the incident—were secured in a squad car, the defendant came back out of his house and told the officers that if they wanted him, they should " 'come and get' " him. *Id*. at 952. He then ran back inside the house and slammed the door. Shortly thereafter, the defendant ran out the back door of his house and into a nearby cornfield. He was not apprehended that day. *Id*.

¶ 29 The defendant was subsequently arrested on a warrant, charged with escape and resisting a peace officer, and convicted on both charges. *Id*. at 939. On appeal, he argued that the escape conviction should be reversed because the State did not prove that he was "in custody." *Id*. at 950-51. The defendant emphasized that although the officer told him that he was under arrest, he "never completed the arrest and, thus, never attained custody over him." *Id*. at 951. The appellate court agreed, finding that the defendant was "not yet in [the] lawful custody of a peace officer," and noting that, "at most, *** the defendant was guilty of resisting arrest." *Id*. at 952.

¶ 30    The defendant argues that this case is analogous to *Kosyla* in that the defendant was "not yet in lawful custody" when he broke away from the officers. In support of this argument, he emphasizes that both officers testified that when Officer Ehler was walking the defendant towards his squad car, he was "trying to gain control over him." He further emphasizes that on cross-examination, Officer Ehler admitted that the defendant was never "in physical custody."

¶ 31    We believe this argument places too much emphasis on the choice of words used by the officers. Although both officers did testify that they had difficulty gaining control over the defendant, they also testified that they had a hold of his arms and were walking him towards the squad car before he broke free. This indicates that although the officers did not have complete control over the defendant, they had enough control to restrain his movement. Similarly, after Officer Ehler admitted that he never considered the defendant to be "in physical custody," he testified that the defendant was never transported to jail. While it appears that Officer Ehler may consider "custody" to arise only after a defendant is taken to jail, that is not true for purposes of the escape statute. As stated previously, a defendant is in "lawful custody" for purposes of the escape statute when an officer exercises a sufficient degree of control over the defendant. *Garza*, 2019 IL App (4th) 170165, ¶ 17; *McClanahan*, 2011 IL App (3d) 090824, ¶ 11. In *Kosyla*, the officers never exercised *any* control over the defendant. That clearly is not true in this case.

¶ 32    The State argues that the instant case is more like *Garza*, *McClanahan*, and *People v. Lauer*, 273 Ill. App. 3d 469 (1995), than *Kosyla*. In each of those cases, the appellate court found that the defendant was "in lawful custody" for purposes of the escape statute when officers "did more than inform [the] defendant that he was under arrest." *McClanahan*, 2011 IL App (3d) 090824, ¶ 16; see also *Garza*, 2019 IL App (4th) 170165, ¶ 22; *Lauer*, 273 Ill. App. 3d at 474.

¶ 33    In *Garza*, two police officers went to the defendant's home in response to a complaint about barking dogs. On the way to the house, they discovered that there was an outstanding warrant for the defendant's arrest in an unrelated case. *Garza*, 2019 IL App (4th) 170165, ¶ 4. When they arrived at the house, the defendant's girlfriend let them in, and they informed the defendant that he was under arrest. *Id*. ¶ 5. The officers allowed the defendant to put a shirt on and say goodbye to his family. One of the officers testified that he "escorted" the defendant as he moved through the house to get a shirt and say goodbye to various family members, always staying within two feet of the defendant. *Id*. The two officers then "escorted" the defendant towards the door, each holding one of his arms. *Id*. ¶ 6. Once outside, the defendant asked if he could smoke a cigarette. The officers allowed him to do so; however, he was told that after he lit the cigarette, he was going to be handcuffed. *Id*. It is unclear whether either officer was holding onto the defendant as he lit his cigarette. However, when he finished, he was asked to turn around and put his hands behind his back. Instead of complying, the defendant took off running. *Id*. On appeal from a conviction for escape, the Fourth District found that the officers exercised sufficient control over the defendant to constitute "lawful custody" for purposes of the escape statute. *Id*. ¶¶ 22-23.

¶ 34    In *McClanahan*, an officer told the defendant he was under arrest. He grabbed onto the defendant, but the defendant struggled. *McClanahan*, 2011 IL App (3d) 090824, ¶ 5. The officer was able to pin the defendant onto the hood of a car; however, when he reached for his handcuffs, the defendant was able to break away. *Id*. On appeal from a conviction for escape, the Third District found that the "defendant was lawfully restrained notwithstanding his resistance." *Id*. ¶ 16. This was so, the court explained, because the officer "physically restrained him and forcefully moved [the] defendant to the hood of the squad car." *Id*.

11

¶ 35    In *Lauer*, two officers responded to a report of a loud party. *Lauer*, 273 Ill. App. 3d at 470. After they ordered the guests to leave, an argument began between the officers and the defendant. The argument soon turned into a scuffle. *Id*. at 471. One of the officers attempted to handcuff the defendant, but he broke away and ran into the house. *Id*. The officers pursued the defendant. Eventually, they caught him in a back bedroom, and one of the officers put his arm around the defendant's neck in a "retention hold." *Id*. As the officer walked the defendant towards the front door, he managed to break free of the retention hold and run out of the house. *Id*.

¶ 36    On appeal from a conviction for escape, the First District rejected the defendant's argument that he was never in lawful custody. *Id*. at 474. The court explained that an officer "actually restrained" the defendant and "physically moved [him] *** to the front part of the house" before he broke free and ran away. *Id*.

¶ 37    Here, as in *Garza*, *McClanahan*, and *Lauer*, the officers did more than tell the defendant he was under arrest. They held him by the arms and walked him towards Officer Ehler's squad car before he broke free of their grip. We therefore find that there was sufficient evidence to prove that he was in lawful custody before breaking away.

¶ 38                        B. Rule 431(b) and Plain Error

¶ 39    The defendant next argues that the court failed to fully comply with Rule 431(b). That rule requires courts to ask jurors whether they both understand and accept four principles known as the *Zehr* principles. See *People v. Thompson*, 238 Ill. 2d 598, 606 (2010); see also *People v. Zehr*, 103 Ill. 2d 472, 477 (1984). Here, the court explained all four principles to the jurors and asked if the jurors accepted the four principles, but the court did not ask whether the jurors understood the principles. As such, the court did not fully comply with the rule. See *People v. Wilmington*, 2013 IL 112938, ¶ 32. The defendant acknowledges that he did not object during *voir dire*, thereby

forfeiting appellate review of this issue. See *People v. Belknap*, 2014 IL 117094, ¶ 47. He asks us to consider it under the plain error doctrine. We find that it is inappropriate to do so.

¶ 40    Under the plain error doctrine, this court may overlook the defendant's forfeiture and consider his claim under two circumstances. Under the first part of the plain error test, we may review his claim if the evidence was so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error. Under the second part of the test, we may consider his claim if the asserted error was so fundamental that it undermined the fairness of the trial and threatened the integrity of the judicial process, regardless of the strength of the evidence. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). The Illinois Supreme Court has held that a claim of failure to comply with Rule 431(b) is cognizable only under the first part of the test—that is, we may consider the claim only if the evidence is closely balanced. *People v. Sebby*, 2017 IL 119445, ¶ 52. This is because although Rule 431(b) is designed to help ensure that criminal defendants are tried by jurors who are fair and impartial, the absence of full compliance does not necessarily lead to a jury is not fair and impartial. *Thompson*, 238 Ill. 2d at 609-10.

¶ 41    Review under the first prong of the plain error test is appropriate when the evidence was so closely balanced that "the error alone severely threatened to tip the scales of justice." *Sebby*, 2017 IL 119445, ¶ 51. The defendant bears the burden of persuasion on the question of whether the evidence was close enough to meet this standard. *People v. Choate*, 2018 IL App (5th) 150087, ¶ 52. Here, we do not believe the defendant can meet that burden.

¶ 42    In arguing that the evidence was closely balanced, the defendant points out that there was no extrinsic evidence—such as body camera video or store security footage—to support the testimony of the two officers. He also points out that the officers' testimony concerning how the

defendant was injured conflicts with that of Dr. Buggs, who was a disinterested witness with no motive to lie. The defendant argues that, absent extrinsic evidence, the matter became a contest of credibility between the two officers and Dr. Buggs. We are not persuaded.

¶ 43　As the State correctly points out, none of Dr. Buggs's testimony related to the crucial question of whether the defendant was in lawful custody before breaking away from the officers and running. As we discussed earlier, the defendant's theory at trial was that the two officers made up the story of the defendant's arrest to cover up the use of excessive force by Officer Ehler. However, virtually no evidence supported this claim. Although defense counsel questioned both officers on the similarities in their police reports, both officers denied that they decided together what they would put in the reports, and the reports themselves were not entered into evidence.

¶ 44　Moreover, there *was* evidence that supported the officers' testimony. A photograph of the beer can was admitted into evidence, and, as noted, the medical evidence showed that the defendant was intoxicated, which tends to support the officers' testimony. The fact that the officers gave accounts of events that were highly consistent also enhances the credibility of their testimony.

¶ 45　We acknowledge that Officer Ehler's claim that Dr. Buggs told him the defendant's injuries were minor and would heal on their own was at odds with the medical evidence. However, while this was something for jurors to consider in assessing his overall credibility as a witness, we do not believe the credibility of the officers' uncontroverted testimony was so suspect that it rendered the evidence to be closely balanced. Because we do not find the evidence to be so closely balanced that the Rule 431(b) error alone severely threatened to tip the scales of justice against the defendant, we decline to consider the defendant's claim under the plain error doctrine.

14

¶ 46                                    C. Sentencing

¶ 47    The defendant's final contention is that the court erroneously considered a factor inherent in the offense of aggravated assault as an aggravating factor in sentencing him on that charge. Specifically, he argues that the threat of harm is inherent in the offense of aggravated assault. The defendant acknowledges that he did not raise this issue at the sentencing hearing, but he asks us to consider his claim under the plain error rule. The first step in plain error analysis is to determine whether an error occurred at all. *Piatkowski*, 225 Ill. 2d at 565. For the following reasons, we conclude that the court did not err in sentencing the defendant.

¶ 48    It is never proper for a sentencing court to consider a factor that is inherent in the offense as an aggravating factor. *People v. Dowding*, 388 Ill. App. 3d 936, 942 (2009). "The burden is on the defendant to affirmatively establish that the sentence was based on improper considerations." *Id*. at 943. Here, we do not believe the defendant can carry this burden for three reasons.

¶ 49    First, we do not agree with the defendant that a threat of serious harm is inherent in the offense of aggravated assault as charged. In support of his argument, the defendant correctly notes that assault is defined as "conduct which places another in reasonable apprehension of receiving a battery." 720 ILCS 5/12-1(a) (West 2014). Battery usually, though not always, involves bodily harm. See *id*. § 12-3(a). The defendant argues that, as such, "a threat of harm is inherent in the offense of aggravated assault." The problem with this argument is that the aggravating sentencing factor at issue applies when the defendant's conduct causes or threatens to cause "*serious* harm." (Emphasis added.) 730 ILCS 5/5-5-3.2(a)(1) (West 2014). In this case, the defendant was charged with aggravated assault, rather than simple assault, because the victim was a police officer, not because he threatened serious bodily harm. See 720 ILCS 5/12-2(b)(4)(i) (West 2014). As such, a threat of serious harm is not inherent in that charge.

15

¶ 50    Second, although it is not entirely clear from the record, it appears that the court most likely found that the defendant's conduct threatened serious harm because he ran across Vienna Street, putting the officers in danger from vehicles as they pursued him. Although the State argued that the defendant's conduct threatened harm both because he threatened Officer Ehler with a battery and because he ran across the street with the officers in pursuit, the trial court specifically found that the defendant did not try to injure either officer. Obviously, a threat of serious harm is not inherent in the offenses of escape and obstructing a peace officer.

¶ 51    Third, even assuming the court considered an improper factor in sentencing, we need not remand for a new sentencing hearing if "it appears from the record that the weight placed upon the improper factor was so insignificant that it did not lead to a greater sentence." *Dowding*, 388 Ill. App. 3d at 945. In this case, all the charges against the defendant were Class A misdemeanors. See 720 ILCS 5/12-2(d), 31-1(a), 31-6(c) (West 2014). The defendant could have been sentenced to up to 364 days in jail (730 ILCS 5/5-4.5-55(a) (West 2014)) and 24 months of conditional release (*id*. § 5-4.5-55(d)). Instead, the defendant received no jail time, and he was sentenced to concurrent sentences of 18 months of probation, which was 75% of the maximum period of probation permissible for a Class A misdemeanor (see *id*. § 5-4.5-55(d)). The fact that the defendant's sentence was substantially lower than the maximum authorized sentence is an important consideration in determining whether the improper aggravating factor was given significant weight. See *Dowding*, 388 Ill. App. 3d at 945.

¶ 52    Considering the defendant's lengthy criminal history and the fact that the court found no mitigating factors, we think it is clear that the court gave little weight to the aggravating factor of the threat of harm when it imposed a sentence that was substantially lower than the maximum. We

16

therefore find that no error occurred during sentencing, and we need not consider whether application of the plain error rule is appropriate.

¶ 53                              III. CONCLUSION

¶ 54    For the foregoing reasons, we affirm the defendant's convictions and sentences.


¶ 55    Affirmed.

2020 IL App (5th) 170481
NO. 5-17-0481
IN THE
APPELLATE COURT OF ILLINOIS
FIFTH DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Union County. |
| | ) | |
| v. | ) | No. 15-CM-146 |
| | ) | |
| RODERICK L. HILEMAN, | ) | Honorable |
| | ) | Charles C. Cavaness, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

**Rule 23 Order Filed:**        December 1, 2020
**Motion to Publish Granted:**   December 21, 2020
**Opinion Filed:**              December 21, 2020

_____

**Justices:**          Honorable Milton S. Wharton, J.

                   Honorable Judy L. Cates, J., and
                   Honorable John B. Barberis, J.
                   Concur

_____

**Attorneys**
**for**
**Appellant**
    James E. Chadd, Appellate Defender, John M. McCarthy, Deputy
Defender, Jessica L. Harris, Assistant Appellate Defender,
Office of the State Appellate Defender, Fourth Judicial District, 400 West
Monroe Street, Suite 303, P.O. Box 5240, Springfield, IL 62705-5240

_____

**Attorneys**
**for**
**Appellee**
    Hon. Daniel Klingemann, State's Attorney, Union County Courthouse,
309 West Market Street, Jonesboro, IL 62952, Patrick Delfino, Director,
Patrick D. Daly, Deputy Director, Valerie A. Ozment, Staff Attorney,
Office of the State's Attorneys Appellate Prosecutor, 730 East Illinois
Highway 15, Suite 2, P.O. Box 2249, Mt. Vernon, IL 62864

_____