NOTICE

Decision filed 01/18/23. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2023 IL App (5th) 190191-U

NO. 5-19-0191

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Montgomery County. |
| | ) | |
| v. | ) | No. 17-CF-23 |
| | ) | |
| JOLLY J. MITCHELL, | ) | Honorable |
| | ) | James L. Roberts, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE MOORE delivered the judgment of the court.
Justice Welch concurred in the judgment.
Justice Vaughan dissented.

**ORDER**

¶ 1   *Held*:   In this direct appeal, the defendant's conviction and sentence, for the offense of possession with intent to deliver a controlled substance, are reversed, and this cause is remanded for further proceedings, because the trial judge erred when he failed to follow the proper course of action following the defendant's request to represent himself at trial. We also vacate the trial judge's ruling on the defendant's pretrial motion to suppress evidence, and remand with instructions that the trial judge consider all of the evidence prior to making his new ruling thereupon. Because we do not think they are likely to recur on remand, we do not address the trial judge's *Zehr* principles error, or his sentencing error.

¶ 2   The defendant, Jolly J. Mitchell, appeals his conviction and sentence, after a trial by jury in the circuit court of Montgomery County, for the offense of possession with intent to deliver a controlled substance. For the following reasons, we reverse the defendant's conviction and

sentence, vacate the trial judge's ruling on the defendant's pretrial motion to suppress evidence, and remand for further proceedings.

¶ 3                                    I. BACKGROUND

¶ 4      We present only the facts necessary to our disposition of this appeal, which are as follows. On January 25, 2017, the defendant was charged, by information, with unlawful possession of a controlled substance (count I, pertaining to a substance containing cocaine), possession with intent to deliver a controlled substance (count II, pertaining to a substance containing cocaine), and unlawful possession of a controlled substance (count III, pertaining to a substance containing heroin). Count III was thereafter amended, in a manner not relevant to the issues raised in this appeal. All three charges resulted from a traffic stop, on Interstate 55 in Montgomery County, of a rented Jeep in which the defendant was a passenger while another individual drove.

¶ 5      On March 24, 2017, during a pretrial hearing, the trial judge advised the defendant about the status of the defendant's case, then asked the defendant if the defendant had any questions. The defendant stated, "Yes, I would like to speak with you." The trial judge told the defendant that he could not speak to the defendant directly about the defendant's case, but that if the defendant had "issues with regard to" his attorney, the defendant could file a written motion, which the judge would then consider. The defendant's attorney thereafter had a conversation with the trial judge about what she perceived to be the defendant's concerns about some of the conditions at the jail where the defendant was housed at that time. The trial judge reiterated to the defendant that the defendant should put his concerns in writing. The defendant replied, "I can't read and write, sir." The trial judge then suggested that the defendant discuss his concerns with his attorney, so that she could put anything into writing that she believed needed to be addressed. The defendant replied that he could not communicate with his attorney because her office did not answer his phone calls,

2

and he had been unable to find other inmates who would help him write to her. The trial judge stated that the defendant's attorney "should be establishing regular times to come see you, discuss your case with you, when she is meeting with you at the jail that would be the opportunity for you to discuss any of these issues that are presenting themselves."

¶ 6     The trial judge then inquired about the defendant's level of education. The defendant answered that the extent of his education was "[f]ourth grade." The defendant's attorney confirmed that she was aware that the defendant "cannot read or write," and that after meeting with him for over two hours the previous day, she had told him that she would raise his concerns about the jail with a correctional captain there, when that captain returned to duty in the following days. The trial judge stated that he hoped the defendant's attorney's efforts would solve the problems, but if they did not, the defendant's attorney could bring it up at the defendant's next court appearance.

¶ 7     When asked by the trial judge if there was "[a]nything else," the defendant stated that he was "going through depression," was not getting all of his required medication at the jail, had previously "been in mental institutions," "needed treatment," and felt "like taking [himself] out." The trial judge then reiterated that the defendant's attorney would attempt to resolve all of the defendant's issues with the jail staff, and noted that if the defendant's attorney believed that the defendant could not assist with his defense, the defendant's attorney would call that to the attention of the court. He set a follow-up court date for March 31, 2017, the end of the following week.

¶ 8     On March 31, 2017, the trial judge began the court date by holding a bond-reduction hearing. Therein, the defendant testified that he was 31 years old, lived in Rockford, Illinois, with his fiancée and two children, and supported them. He testified that he also supported two other children he has, from the money he earned "landscaping and plowing snow." He testified that he also was employed by his fiancée's father, "like a janitor," doing work "[c]leaning old buildings

3

out." He testified that his incarceration was "stressful" for his family, and that they were "going through a lot of emotional problems" with him being away and unable to support them. He testified that it was difficult for him to be incarcerated because he was "schizophrenic and bipolar," and that prior to his incarceration he "was going to Rosecrance[,] *** a mental counseling place in Rockford, Illinois that was helping *** with *** treatment and *** proper medication," and where he was able to speak to his "doctors and stuff on a daily, regular basis." He testified that he could not currently post bond, but that if the amount was reduced, and he posted it, he would comply with any conditions of the bond.

¶ 9      On cross-examination, the defendant denied that he had active arrest warrants at the time of his arrest in this case, but agreed that he had previously failed to appear in court when he was incarcerated in a different area. The State made an offer of proof as to the defendant's criminal history. The parties thereafter offered argument, and the trial judge denied the motion to reduce bond. The trial judge noted that the defendant was entitled to medical treatment, including mental health treatment, but that he believed the defendant could receive that while incarcerated at the county jail.

¶ 10      On April 20, 2017, a pretrial status hearing was held. At the outset of the hearing, the defendant's attorney stated that she believed the defendant wished to address the court. She stated that because the defendant could not read or write, he "could not write a motion for a new counsel," but she believed he "seem[ed] very dissatisfied with" her and wished to ask for new counsel. The trial judge then asked the defendant what he wished to raise with the court. The defendant responded that he and his attorney were "not communicating," were "having problems," and that although he asked "her to do things," she never had answers for him. He added, "I would like to

4

go *pro se*, sir." The following colloquy then occurred, which we quote in its entirety, due to its significance to this appeal:

"THE COURT: Anything additional? And I'm going to need some more information than that[,] other than you and your attorney arguing.

[THE DEFENDANT]: We're not getting along.

THE COURT: I need specifics. Tell me has she provided discovery to you and discussed discovery with you?

[THE DEFENDANT]: No. She's not helping me understand my discovery. I don't understand. Like, I'm asking her questions and she don't [*sic*] break anything down to me or anything what's really going on with my situation. So I would like to go pro se.

THE COURT: Mr. Mitchell, what's the extent of your education? How far did you go in high school?

[THE DEFENDANT]: Um, 8th grade, 9th grade.

THE COURT: So you don't have a GED or any kind of a high school equivalency?

[THE DEFENDANT]: No, Your Honor.

THE COURT: Okay. And then the indication was that you can't read or write; is that correct?

[THE DEFENDANT]: Yes, sir.

THE COURT: How would you expect to be able to represent yourself if you can't prepare motions, you can't read pleadings? How could you represent yourself if you can't do those things?

[THE DEFENDANT]: Um, I have other people to help me. I can find someone else to help me that will represent me.

5

THE COURT: Do you wish to have an opportunity to hire an attorney of your own choosing?

[THE DEFENDANT]: Yes. I'll try to hire an attorney.

THE COURT: Do you have resources that you could hire counsel?

[THE DEFENDANT]: Yes, sir.

THE COURT: Because, Mr. Mitchell, you absolutely have a right to hire an attorney of your own choosing. You asked me to appoint counsel indicating that you could not afford to hire an attorney. So I appointed Miss Mattson on that basis. You absolutely have a right if you want time to hire your own attorney that you can do that.

[THE DEFENDANT]: I would like to have another—represent myself and have someone else. We're not getting along.

THE COURT: Okay. Well, Mr. Mitchell, the problem that the Court has is that you absolutely have a right to represent yourself, but the Court has to be assured that you can do that. Based on the fact that you can't read and write, based on your own indications, you would not be able to sufficiently represent yourself in a felony matter because you could not read pleadings. You would not be able to read or understand the charges against you. You would not be able to file any motions on your own behalf unless you hire other counsel or if you have other people. You can't just have someone come and help you that's not an attorney. So when you are talking about other resources, I don't know what specifically are you talking about as to who would be able to help you?

[THE DEFENDANT]: They have law books like it's in the jailhouse here to show you how to write up motions.

THE COURT: But my understanding is that you can't read.

6

[THE DEFENDANT]: No, other inmates help me, show me.

THE COURT: Okay. You know and, Mr. Mitchell, other inmates are not attorneys, and other inmates are not adequate legal representation. So if you're asking me to allow you to represent yourself and you can't read and write, with the assistance of other inmates, I have to decline that request. That's not assuring that you're going to be fairly represented ***."

¶ 11 Following an interruption, the trial judge continued speaking with the defendant. He reiterated his position that "not getting along is not sufficient for me to remove her as your attorney," then asked several further questions about the defendant's disagreements with his attorney, and for specific examples of what the defendant disagreed with. He then gave the defendant's attorney the opportunity to respond. She stated that she had "been meaning to get a motion to suppress on file," but had been busy, and stated that the defendant offered "a true complaint" that she had not yet filed the motion. She noted that she was awaiting further discovery, in terms of lab work, and was having issues with the audio from the recording of a police interview with the defendant's codefendant following the traffic stop that led to the arrest of the two men. A discussion of the various delays in the case followed. The trial judge then explained to the defendant the general procedure followed in Montgomery County, with regard to pretrial appearances leading up to trial, and assured the defendant that despite the pretrial hearings, the defendant's speedy trial rights would remain intact. He then stated that in light of what he knew of the case, and what the defendant's attorney had represented to the court at the hearing, that he believed the defendant's attorney was "doing what you are entitled to and that's reasonable and sufficient representation of you in these matters." The trial judge then added the following:

7

"You do have an absolute right to represent yourself, but the Court has to be satisfied that you can do that. Based on your representations to this Court and what you've suggested to me, you've indicated that you had a background of education that included special education, that you are limited in your ability to read and write, in spite of and there was a hearing with regard to your circumstance, and based on my observations of you and your comments to the Court, I think it's inconsistent with your suggestions of your lack of understanding. Based on your communications with the Court, it appears to me that you clearly understand the process and what's going on. Now, I haven't had enough contact with you to suggest that maybe you are playing games with the Court, but under this circumstance and what you've provided to me I'm going to deny your request to remove Miss Mattson as your attorney. Now that's without prejudice. That means that if there are further problems and if you have further issues, I will re-entertain your request at a later date, but my suggestion at this point is to give Miss Mattson the opportunity to [do her job]."

¶ 12    The defendant thereafter stated, "I don't want her." After the trial judge admonished the defendant about some of the possible benefits of keeping his attorney, and encouraged the defendant to discuss possible strategies with her, the defendant stated, "I don't want to speak with her, sir. I don't want to talk to her." The trial judge then stated, "So are you choosing to not accept representation by Miss Mattson?" The defendant answered, "I want to go *pro se*," which prompted the trial judge to state the following:

"Mr. Mitchell, I've already told you why I'm not going to permit you to do that. You can't have it both ways. You tell me that you can't read or write, but then you tell me you want to represent yourself and you can't read or write, and you would not be able to effectively

8

represent yourself *pro se* in a major criminal felony matter if you cannot read or write. And you've not given me any explanation as to how you intend to be able to get that done other than assistance from other inmates at the jail, which is not sufficient legal representation. They may tell you they know what they are doing, but trust me most of them have no clue. They think they do, but just because they can read a law book doesn't mean they have the ability to advise you appropriately with regard to major felony cases or minor misdemeanor cases. They are not qualified to represent you. So that's not a reasonable alternative, but I'm willing to allow Miss Mattson to have a further opportunity to remedy some of these complaints that you have and to further represent you, and I think that's reasonable for me to do that. If you are a reasonable person, I think you would accept that opportunity. If after that your representation or, I'm sorry, your relationship is still broken down, I may allow you to renew your request and reconsider what I've ruled today, but I need to know that you are making a reasonable effort, that you are not being obstinate or that you're just not being difficult. Do you understand all of that?"

¶ 13   The defendant answered that he did not understand, and reiterated that he did not wish to be represented by his attorney. The trial judge then stated that he was making a docket entry that, *inter alia*, noted that the defendant "request[ed] an opportunity to proceed *pro se*." He thereafter added that he was "finding that your request to proceed *pro se* at this point is not a legitimate request because you claim as you are unable to read and write and that your intent is to rely upon fellow jail inmates to provide you legal advice." He added that this was "not appropriate, and the Court is not satisfied based on the information that you've provided to me that Miss Mattson's efforts on your behalf have fallen below a reasonable standard." He again encouraged the

9

defendant to work with his attorney, but did not again mention, specifically, the defendant's request to proceed *pro se*.

¶ 14    On May 1, 2017, the defendant's attorney filed a motion to suppress evidence, on the basis that, *inter alia*, the Illinois State police officer who conducted the traffic stop that led to the arrest of the defendant "unnecessarily delayed the traffic stop by using his own K-9 to perform a dog sniff rather than completing the written warning." On May 2, 2017, a hearing was held on the defendant's motion to suppress evidence. Jordan Jackson, the Illinois State police officer in question, was the sole witness to testify. We need not, for purposes of this appeal, discuss all of his testimony in detail, other than to note that he testified extensively about the condition of the rented Jeep, and the behavior and demeanor of both the defendant and the driver of the Jeep during the traffic stop, all of which Jackson claimed were suspicious and led Jackson to conduct a drug sniff of the Jeep with his K-9. We note as well that at one point during Jackson's testimony, when Jackson repeatedly could not recall details of the traffic stop, the State requested "a five-minute recess" so that Jackson could review his report of the stop. Following the recess, the trial judge stated the following:

> "The Court's going to note that we did take a recess to permit the officer to review his report. I'm going to further note in fairness to the officer this motion was just filed yesterday and scheduled for a hearing today, so it was somewhat of a pop-up surprise although this matter is scheduled for trial this week. So having said that if the officer has had an opportunity to review his report and the State is ready to proceed, you can resume your questioning."

¶ 15    The State continued its questioning of Jackson. Thereafter, Jackson agreed that the traffic stop was recorded, and agreed with the State's assertion that "with regards to several of the

questions that you had to refresh your recollection with regards to the report, those were all questions that were captured on audio and video." Jackson then authenticated a CD copy of the video and audio recording of portions of the traffic stop, in particular Jackson's conversation, in his squad car, with the driver of the Jeep, and "the dog search." The trial judge asked if there were audio issues with the CD of the recording. Both the State and the defendant's attorney stated that they believed there were no audio issues with the CD of the recording, and discussed audio issues they had with a different recording. Thereafter, the trial judge again asked if the audio and video of the CD of the traffic stop was working. The parties again agreed that it was. During argument, the State contended that the drug sniff was justified, in part, by Jackson's observation of the nervous and suspicious behavior and demeanor of both the driver and the defendant, as well as the condition of the vehicle and other circumstances revealed during the traffic stop. The defendant's attorney, on the other hand, contended that the driver's statements to Jackson were consistent and were not "varying stories" even if some of his answers seemed strange. She further argued, "They weren't varying stories, and they all had innocent explanations, and the reasonable suspicion should not arise from a passenger in a vehicle turning his head and watching an officer walk up to their vehicle while they are seized on a roadway." She added, "That is a curiosity when you're getting pulled over, watching the officer come. Your Honor, this is not—there was not reasonable articulable suspicion at that time to do a dog sniff what—and to prolong the stop. This was an unreasonable prolongment of the stop."

¶ 16    The trial judge thereafter stated the following:

"Here's the question, and I've been submitted now a CD to look at, and I don't know that the CD is going to assist the Court. I think the arguments are consistent with regard to circumstances and facts as they happened, but it's been offered for the Court to review.

11

"*** So the question that the Court has to determine is whether or not the officer's actions were unreasonable under the totality of the circumstances and whether his act prolonged this stop unreasonably. The Court is going to find that it did not, because of all of the issues that the officer—and if you take everything independently, then it's problematic, but the Court has to take it in the totality of the circumstances what the officer had before him to determine whether there was some independent basis for the officer to inquire further, and I disagree with your characterization of [the driver's] answers. I think they were not consistent with the story that he was telling."

The trial judge then discussed in detail purported inconsistencies in the driver's story, all apparently derived from Jackson's testimony, as no recess had occurred, and no publication of the CD recording had been made on the record, and therefore there is no reason to believe that the trial judge had watched or listened to the CD recording of the conversation between Jackson and the driver in the squad car. The trial judge then added the following:

"Normally the officer said if that was all the case and everything else being equal he would have likely permitted him to go, but with—and armed with all of this additional information and based on the officer's description of what he thought was and the State characterized it as furtive movements but at least suspicion movements by the passengers in the vehicle the Court has to take that all into consideration in determining whether or not this officer had some individualized suspicion independent of the initial stop for speeding, and I find that they've articulated that sufficiently for the Court.

So under the circumstance I'm going to find that the canine search was not unlawful, and there was a basis for that and that—and I'm going to deny then the motion to suppress the evidence for those reasons stated on the record."

12

¶ 17    The trial judge thereafter admonished the defendant about his upcoming trial, reminding the defendant that the defendant previously "asked that Miss Mattson be removed as your counsel so that you could proceed on your own. The Court denied that motion for the reasons indicated on the record before based on your representations to me with regard to your ability to read and/or write." He noted that the defendant's attorney now believed that continuing the defendant's scheduled jury trial was advisable so that she could ensure the defense was fully prepared, and he encouraged the defendant to consult with his attorney and consider her advice. He added, "The whole purpose of this is to put you in a better light so that your rights are upheld. That was the reason why the Court denied your request to represent yourself, because I was satisfied that you wouldn't be able to sufficiently represent yourself based on your indications that you can't read and write."

¶ 18    The case proceeded to trial, on count II (possession with intent to deliver a controlled substance, pertaining to a substance containing cocaine) only, and the trial judge, *inter alia*, admonished the potential jurors with regard to three of the four required *Zehr*[1] principles. It is undisputed that the trial judge did not mention, at all, the fourth required *Zehr* principle, which is that jurors must understand and accept that they may not hold it against a defendant if the defendant chooses not to testify at trial. Because it is not relevant to our disposition of the issues raised by the defendant in this appeal, we need not discuss the defendant's trial in detail. At the trial's conclusion, the jury found the defendant guilty of possession with intent to deliver a controlled substance.

---

[1]See *People v. Zehr*, 103 Ill. 2d 472, 477 (1984), and its progeny. Pursuant to these cases and related codification, potential jurors must understand and accept that a defendant (1) is presumed innocent of the charge(s) against the defendant, (2) is not required to offer any evidence on the defendant's own behalf, (3) must be proved guilty beyond a reasonable doubt, and (4) may not have the defendant's failure to testify held against the defendant.

¶ 19    Prior to the sentencing of the defendant, as the trial judge addressed the defendant's *pro se* posttrial claim that he was not fit to stand trial in this case, the defendant's attorney asserted, *inter alia*, the following:

> "I never had a bona fide doubt as to [the defendant's] fitness. He definitely has limited understanding in some areas and with his limited education, however, he was able to assist me the whole time with his trial and he also was able to respond—respond appropriately to me, seemed to understand the nature of the court, the Judge, the State's Attorney, and my role in this. So I didn't feel like we had a fitness issue throughout the pendency of the trial."

The trial judge thereafter addressed the defendant directly with regard to this issue, stating the following:

> "In your appearances and your exchanges with the court, you appear to be lucid and I acknowledged and your suggestions that you had some limited capacity with regard to your ability to read and write, but you have been able to and you have been cognizant and aware throughout the court hearings. You have been responding appropriately. You seem to digest and understand the communication before the court."

The trial judge subsequently added the following:

> "So the court had the opportunity to personally observe you in close chambers. There was an exchange between you and your attorney and it wasn't just yes or no answers or questions. You appeared to be fully aware of what was going on. Your surroundings, the issues before the court, and the issues that were being addressed with regard to jury selection and other matters, you were given an opportunity to discuss those issues with your attorney and you appeared to respond and address the matters appropriately."

14

The trial judge then denied all of the defendant's posttrial claims. Following other procedural matters not relevant to our disposition of this appeal, the defendant ultimately was sentenced to 13 years in the Illinois Department of Corrections, to be followed by 3 years of mandatory supervised release. This timely appeal followed. Additional facts will be presented as necessary throughout the remainder of this order.

¶ 20                                              II. ANALYSIS

¶ 21    On appeal, the defendant raises four claims of error, which we restate as follows: whether the trial judge erred when he (1) denied the defendant his right to represent himself, (2) denied the defendant's pretrial motion to suppress evidence, including by making his denial without first considering all of the relevant evidence that was before him, (3) failed to properly admonish the potential jurors with regard to the *Zehr* principles, and (4) considered improper factors in aggravation when fashioning the defendant's sentence. We find, as explained in detail below, that the first of these claims of error—that the trial judge erred when he denied the defendant his right to represent himself—is dispositive of this appeal, and impacts whether it is appropriate for us to consider the remaining contentions. Moreover, because, for the following reasons, we do not reach any issues related thereto, we hereby deny, as moot, the State's motion—which previously we ordered to be taken with the case—to strike portions of the defendant's reply brief that the State claims are not proper.

¶ 22    "The state and federal constitutions guarantee a defendant the right to self-representation in the trial court." *People v. Sheley*, 2012 IL App (3d) 090933, ¶ 19 (citing U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8). "In order to exercise that right, the defendant need only knowingly and intelligently relinquish [the defendant's] parallel right to counsel." *People v. Woodson*, 2011 IL App (4th) 100223, ¶ 20 (citing *Faretta v. California*, 422 U.S. 806, 835 (1975)).

15

"Whether a defendant has made an intelligent waiver of the right to counsel depends, in each case, 'upon the particular facts and circumstances of that case, including the background, experience, and conduct of the accused.' '' *Id.* (quoting *People v. Baez*, 241 Ill. 2d 44, 116 (2011)). The determination of whether a defendant has made a knowing and intelligent waiver of the right to counsel will not be reversed by this court on appeal unless there has been an abuse of the trial court's discretion. *Id.* ¶ 21. "A court abuses its discretion, however, when it applies the improper legal standard." *Id.*

¶ 23    "The right to counsel is so fundamental that it should not be 'lightly deemed waived.' '' *People v. Washington*, 2016 IL App (1st) 131198, ¶ 45 (quoting *People v. Robertson*, 181 Ill. App. 3d 760, 763 (1989)). Moreover, "[e]rrors affecting substantial rights may be addressed on review even if they were not raised in a posttrial motion." *Id.* (citing *People v. Langley*, 226 Ill. App. 3d 742 (1992)). Thus, the appellate court will consider errors related to the denial of a defendant's right to self-representation even if those errors were not raised, and therefore preserved, in a posttrial motion. *Id.* When a defendant invokes the right to self-representation, and to therefore proceed *pro se*, Illinois Supreme Court Rule 401(a) (eff. July 1, 1984) requires the trial judge to determine whether the defendant understands (1) the nature of the charge or charges faced by the defendant, (2) the sentencing range faced by the defendant, including the penalty to which the defendant may be subjected due to other convictions, and (3) the defendant's right to counsel and to have counsel appointed due to indigency.

¶ 24    A trial judge may not deny a defendant's request to proceed *pro se* on the basis that the trial judge believes the defendant lacks the legal knowledge and ability to represent himself. *Woodson*, 2011 IL App (4th) 100223, ¶ 23. To the contrary, our courts, including the Illinois Supreme Court, have long recognized that even if a defendant's choice to proceed *pro se* appears

16

to be unwise, and may prove to be quite detrimental to the defendant, as long as the choice " 'is freely, knowingly, and intelligently made, it must be accepted.' " *Id.* (quoting *Baez*, 241 Ill. 2d at 116). If a trial judge nevertheless denies a defendant's request to proceed *pro se* on the basis that the defendant "did not have sufficient legal knowledge and expertise to represent himself," the trial judge has applied the incorrect legal standard and has abused his discretion. *Id.* ¶¶ 25-26. We note as well that although the United States Supreme Court has held that the right to self-representation can be limited based on the mental competency of a defendant, that is only the case where it is clear from the record that the defendant suffered from a severe mental illness that would affect the defendant's competency to conduct a defense. *Sheley*, 2012 IL App (3d) 090933, ¶¶ 22-28.

¶ 25   In this case, the State first argues that no error occurred because, according to the State, "[t]he defendant's requests to proceed *pro se* in this case were not clear and unequivocal, as required by the law." The State posits that "the defendant indicated he would have other people help him, find someone else to help him that will represent him, and even indicated he would try to hire an attorney," and that the defendant further "indicated to the court that he would have other inmates help him," all of which "shows that the defendant did not really have a desire to be without counsel, but instead wished to have someone assist him or represent him." We do not agree. As the dialogue between the trial judge and the defendant, quoted extensively above, indicates, the defendant made *multiple* clear and unequivocal requests to represent himself in this case. It was only after his requests were refused or questioned that he mentioned having other inmates help him, and it was only in response to the trial judge's direct, leading question thereafter—"Do you wish to have an opportunity to hire an attorney of your own choosing?"—that he answered, "Yes. I'll try to hire an attorney."

17

¶ 26    It is equally clear from the dialogue that the trial judge understood the requests to be clear and unequivocal, as he repeatedly addressed the requests on their merits, and repeatedly stated, on the record, his reasons for denying the requests, never stating that the defendant's requests were not clear and unequivocal. In addition to the foregoing problems, it is clear that the trial judge placed additional requirements—not recognized by any court of which we are aware—on the defendant prior to allowing the defendant to invoke his right to proceed *pro se*, such as (1) requiring the defendant to explain, in detail, why he was having difficulties with his current counsel, as well as the nature of those difficulties, and (2) stating to the defendant that part of the reason he was denying the defendant's request was because the trial judge believed the defendant was receiving reasonable representation from his current counsel—whose efforts, the trial judge stated, the defendant had not shown had "fallen below a reasonable standard"—and that if he allowed the defendant to represent himself he would not be "assuring that you're going to be fairly represented," both of which apparently the trial judge believed were legally sufficient reasons to deny the defendant his fundamental right to represent himself. They were not. In addition, the trial judge told the defendant that he would only reconsider his denial of the defendant's request to proceed *pro se* if he believed that the defendant was "making a reasonable effort *** not being obstinate or *** just not being difficult" with his present attorney, another requirement imposed by the trial judge that has no basis in the law.

¶ 27    The State also encourages this court to find no error in this case because, according to the State, the present case is distinguishable from *Woodson* in that here the trial judge "did not focus on the defendant's lack of *legal* knowledge, understanding, or expertise, but *** considered his basic ability to read or write *at all*." (Emphases in original.) We are not persuaded by the distinction the State attempts to make, at least not under the facts of this case. In this case, the trial judge

18

repeatedly tied the defendant's inability to read and write *directly* to what the trial judge perceived to be the defendant's lack of legal knowledge and consequent inability to represent himself, asking such questions as, "How would you expect to be able to represent yourself if you can't prepare motions, you can't read pleadings?" and stating, "you would not be able to effectively represent yourself *pro se* in a major criminal felony matter if you cannot read or write," all without ever making even a semblance of the proper inquiry required pursuant to Rule 401(a). Indeed, instead of inquiring, pursuant to Rule 401(a), as to whether the defendant understood the nature of the charges he faced, the trial judge made the unsupported assumption that the defendant did not, stating that because the defendant could not read or write, the defendant "would not be able to read *or understand* the charges against [him]." (Emphasis added.)

¶ 28     The State also invites this court to find that because the trial judge was aware of the defendant's mental health issues, the trial judge "could appropriately consider the defendant's mental capacity as another common criterion used to assess whether he was able to knowingly and intelligently waive his right to counsel." However, it is clear from the record that the trial judge did not believe the defendant had mental health issues that would prevent him from representing himself. When, posttrial, the defendant made the *pro se* assertion that he was not fit to stand trial, the defendant's attorney asserted, *inter alia*, the following:

> "I never had a bona fide doubt as to [the defendant's] fitness. He definitely has limited understanding in some areas and with his limited education, however, he was able to assist me the whole time with his trial and he also was able to respond—respond appropriately to me, seemed to understand the nature of the court, the Judge, the State's Attorney, and my role in this. So I didn't feel like we had a fitness issue throughout the pendency of the trial."

19

The trial judge thereafter addressed the defendant directly with regard to this issue, stating the following:

> "In your appearances and your exchanges with the court, you appear to be lucid and I acknowledged and your suggestions that you had some limited capacity with regard to your ability to read and write, but you have been able to and you have been cognizant and aware throughout the court hearings. You have been responding appropriately. You seem to digest and understand the communication before the court."

The trial judge subsequently added the following:

> "So the court had the opportunity to personally observe you in close chambers. There was an exchange between you and your attorney and it wasn't just yes or no answers or questions. You appeared to be fully aware of what was going on. Your surroundings, the issues before the court, and the issues that were being addressed with regard to jury selection and other matters, you were given an opportunity to discuss those issues with your attorney and you appeared to respond and address the matters appropriately."

¶ 29 Thus, on the record before us, we decline to speculate that if a full inquiry into the defendant's mental health issues had been made with regard to the specific question of the defendant's ability to represent himself, the trial judge would have reached the conclusion that the defendant lacked the mental competency to do so. See *Sheley*, 2012 IL App (3d) 090933, ¶¶ 22-28 (although United States Supreme Court has held that the right to self-representation can be limited based on the mental competency of a defendant, that is only the case where it is clear from the record that the defendant suffered from a severe mental illness that would affect the defendant's competency to conduct a defense). If, on remand, there are reasons to suspect that the defendant is

20

not fit to stand trial, and/or to represent himself at trial, we presume the trial judge will follow the proper procedures for dealing with such situations.

¶ 30     We stress that it is clear from the record that the trial judge believed he was acting in a manner that would provide the defendant with the best representation possible under the circumstances. However, it is equally clear that there was no legitimate legal basis for the trial judge, even with the best of intentions, to deny the defendant his constitutional right to represent himself at trial. Representing himself may have been a very bad idea, and may have led to a very undesirable outcome for the defendant, but under the circumstances of this case, it was something the defendant had the right to do. Because the trial judge improperly denied the defendant his fundamental right to represent himself at trial, we reverse the defendant's conviction and sentence and remand for further proceedings.

¶ 31     In addition, because of its potential relevance to the proceedings on remand, we turn to the defendant's second contention on appeal: that the trial judge erred when he denied the defendant's pretrial motion to suppress evidence, including by making his denial without first considering all of the relevant evidence that was before him. Because we are reversing and remanding on other grounds, we do not believe it is necessary, or advisable, for us to—as both parties at times suggest—consider all of the evidence, including that not considered by the trial judge, and then act as the trier of fact with regard to the ultimate question of whether the motion to suppress should have been granted or denied, particularly with regard to the factual question of whether Trooper Jackson had an individualized suspicion that was independent of the initial traffic stop, and which therefore would have justified Jackson's further investigation even if it did prolong the stop. Although it is clear from the record that Jackson could not, at the hearing, independently recall many of the events in question—indeed, so much so that the trial judge went so far as to grant a

recess so that Jackson could review his report of the events to refresh his memory before continuing with his testimony—we, as a reviewing court, are not well situated to evaluate Jackson's credibility as a whole, as we were not present to witness his demeanor or other indicia of his credibility and reliability during his extensive testimony at the hearing.

¶ 32    However, we do agree with the defendant that, as a general proposition of law, it is incumbent upon a trial judge to consider all relevant evidence before ruling on a matter. See, *e.g.*, *People v. Bowen*, 241 Ill. App. 3d 608, 624 (1993). In this case, it is clear from the record that the trial judge did not review the CD recording of some of the events surrounding the traffic stop before rendering his ruling on the defendant's motion to suppress evidence. As described above, after argument was presented at the hearing, the trial judge stated the following:

> "Here's the question, and I've been submitted now a CD to look at, and I don't know that the CD is going to assist the Court. I think the arguments are consistent with regard to circumstances and facts as they happened, but it's been offered for the Court to review. *** So the question that the Court has to determine is whether or not the officer's actions were unreasonable under the totality of the circumstances and whether his act prolonged this stop unreasonably. The Court is going to find that it did not, because of all of the issues that the officer—and if you take everything independently, then it's problematic, but the Court has to take it in the totality of the circumstances what the officer had before him to determine whether there was some independent basis for the officer to inquire further, and I disagree with your characterization of [the driver's] answers. I think they were not consistent with the story that he was telling."

The trial judge then discussed in detail purported inconsistencies in the driver's story, all apparently derived from Jackson's testimony, as no recess had occurred, and no publication of the

22

CD recording had been made on the record, and therefore there is no reason to believe that the trial judge had watched or listened to the CD recording of the conversation between Jackson and the driver in the squad car. The trial judge then added the following:

> "Normally the officer said if that was all the case and everything else being equal he would have likely permitted him to go, but with—and armed with all of this additional information and based on the officer's description of what he thought was and the State characterized it as furtive movements but at least suspicion movements by the passengers in the vehicle the Court has to take that all into consideration in determining whether or not this officer had some individualized suspicion independent of the initial stop for speeding, and I find that they've articulated that sufficiently for the Court.

> So under the circumstance I'm going to find that the canine search was not unlawful, and there was a basis for that and that—and I'm going to deny then the motion to suppress the evidence for those reasons stated on the record."

¶ 33    Although the State contends on appeal that the trial judge's failure to consider the CD recording is irrelevant "because the arguments from both parties, based on the facts and circumstances as they happened, were consistent," and therefore "the video was not likely to provide any additional guidance to the court to assist in its ruling," we agree with the defendant that the State's "argument fails to recognize that the trial court was required to weigh the credibility of Jackson's testimony, something that would be exceedingly difficult to do without actually watching the admitted video of what occurred." We note that this is particularly true with regard to the trial judge's subsequent finding, on the basis of Jackson's testimony alone, that Jackson had articulated an "individualized suspicion independent of the initial stop for speeding"—a finding that required the trial judge to determine whether "a reasonable officer could conclude—

23

considering *all of the surrounding circumstances, including the plausibility of the explanation itself*—that there was a 'substantial chance of criminal activity.' " (Emphasis added.) *District of Columbia v. Wesby*, 583 U.S. ___, ___, 138 S. Ct. 577, 588 (2018). Certainly, viewing the CD recording would have helped the trial judge determine whether Jackson's evaluation of the situation was accurate and credible, and whether a reasonable officer would have reached the same conclusions Jackson testified that he reached.

¶ 34    Thus, under the unique circumstances of this case, because we are reversing the defendant's conviction and remanding for a new trial on other grounds, we believe that the prudent course of action in this case is to also vacate the trial judge's ruling on the motion to suppress. In addition to the foregoing analysis, we note that where, as here, it is clear from the record that the sole live witness at a hearing on a motion to suppress cannot independently recall many of the events in question—indeed, where a trial judge has gone so far as to grant a recess so that the witness can review his report of the events to refresh his memory before continuing with his testimony—we believe it is critical that a trial judge consider all of the available evidence (which in this case includes the CD recording of some of the events surrounding the traffic stop) to determine whether that evidence supports, contradicts, or does not speak to, the testimony from such a witness. Indeed, we reiterate that at the hearing, Jackson agreed that the traffic stop was recorded, and agreed with the State's assertion that "with regards to several of the questions that you had to refresh your recollection with regards to the report, those were all questions that were captured on audio and video." Thus, for the foregoing reasons, if on remand the defendant renews his request that the evidence be suppressed, the trial judge must make a new decision regarding that request, based upon all of the evidence available to the trial judge at that time, applying the appropriate legal standards.

24

¶ 35 We note as well that although the defendant asks this court to remand for further proceedings on the motion to suppress in front of a *different* trial judge, the defendant cites no authority for the proposition that a different judge must rule on the defendant's motion to suppress, should the defendant renew that motion. Accordingly, the defendant has forfeited consideration of his request. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (argument must contain the contentions of the appellant, the reasons therefor, and the citation of authorities; points not argued in an opening brief are forfeited and shall not be raised in the reply brief, in oral argument, or in a petition for a rehearing). Forfeiture notwithstanding, because we do not believe the trial judge in this case acted with any kind of bias or malice toward the defendant with regard to the defendant's motion to suppress, we do not believe it is necessary for a different judge to handle the motion to suppress on remand.

¶ 36 We further determine that in this case, principles of double jeopardy do not bar a retrial of the defendant, because we have thoroughly considered the evidence presented at the defendant's trial, all of which is included in the record on appeal, and conclude that it was sufficient to sustain his conviction. See, *e.g.*, *People v. Jamison*, 2014 IL App (5th) 130150, ¶ 18 (if evidence was sufficient to convict the defendant, principles of double jeopardy do not preclude retrial). We note as well that the defendant does not argue on appeal that the evidence presented at trial was not sufficient to sustain his conviction. With regard to the defendant's remaining two contentions of error, there is no shortage of clear and helpful guidance from this court and the Illinois Supreme Court to trial judges with regard to the requirements related to the *Zehr* principles, and with regard to the proper factors to be considered in sentencing. Accordingly, we have no reason to believe that errors with regard to these issues will occur on remand, should there be a new jury trial requiring *Zehr* admonishments, and/or should there be a new sentencing hearing.

¶ 37                                    III. CONCLUSION

¶ 38    For the foregoing reasons, we deny, as moot, the State's motion to strike portions of the

defendant's reply brief, and we reverse the defendant's conviction and sentence, vacate the trial

judge's ruling on the defendant's pretrial motion to suppress evidence, and remand for further

proceedings that are consistent with this order.[2]

¶ 39    Conviction and sentence reversed; ruling on motion to suppress evidence vacated; cause

remanded for further proceedings; State's motion to strike portions of defendant's reply brief

denied as moot.

¶ 40    JUSTICE VAUGHAN, dissenting:

¶ 41    I respectfully disagree with my colleague's disposition that the trial court decision was in

error when the trial court did not allow the defendant to proceed *pro se*. I also believe the trial

court's error in not watching the traffic stop footage as part of the motion to suppress hearing was

harmless. Although not addressed by the majority, I believe the trial court's denial of the motion

to suppress was not in error where it found the police officer formed a reasonable, independent

suspicion to justify prolonging the traffic stop to conduct a dog sniff. Finally, I believe the trial

court's decision should be affirmed where its failure to instruct the jury on the fourth *Zehr* principle

during *voir dire* and its consideration of improper factors in sentencing did not amount to plain

error.

¶ 42                                    I. *Pro Se* Request

¶ 43    At the April 20, 2017, status hearing, which was less than two weeks before the first

scheduled trial date of May 1, 2017, trial counsel advised the court that the defendant wished to

---

[2]We deny, as moot, the defendant's motion to issue a ruling which was filed on January 3, 2023. We also note that the defendant sought, and was granted, leave to cite additional authority on July 1, 2022. The allowed briefing on the additional authority was filed by both parties by July 14, 2022.

address the court about getting new counsel. The defendant told the court that he and his attorney were not communicating and that she was not doing what he asked her to do. He then stated, "I would like to go *pro se*, sir." After the court questioned the defendant about his dissatisfaction with current counsel, the defendant again told the court he "would like to go *pro se*." The court asked him how far he had gone in school, to which the defendant answered, "Um, 8th grade, 9th grade." The defendant also indicated that he did not have a GED or any high school equivalency. The court noted that the defendant could not read or write and asked him how he would be able to represent himself since he would not be able to prepare motions or read pleadings. The defendant replied, "Um, I have other people to help me. I can find someone else to help that will represent me." The court then asked him if he would like to have an opportunity to hire an attorney. The defendant answered, "Yes. I'll try to hire an attorney," and told the court that he had the resources to hire counsel. After the court stated that the defendant had the right to hire counsel of his own choosing, the defendant told the court, "I would like to have another—represent myself and have someone else." When the court asked him how he would be able to represent himself, the defendant stated, "They have law books like it's in the jailhouse here to show you how to write up motions." When the court reminded the defendant that he could not read, the defendant told the court other inmates could help him.

¶ 44    The court told the defendant that it was denying his request to proceed *pro se*, but stated, "Now that's without prejudice. That means that if there are further problems and if you have further issues, I will re-entertain your request at a later date, but my suggestion at this point is to give Miss Mattson the opportunity to [do her job]." The defendant stated again that he wished to "go *pro se*," to which the court stated, "If after that *** your relationship is still broken down, I may allow you to renew your request and reconsider what I've ruled today, but I need to know that you are making

27

a reasonable effort, that you are not being obstinate or that you're just not being difficult. Do you understand all that?" The defendant answered that he did not understand and did not wish to be represented by his current counsel.

¶ 45    At his hearing on May 2, 2017, although the trial court reminded the defendant about his previous request to proceed *pro se* and again indicated that it would entertain reconsidering its earlier decision, the defendant did not renew his request. Nor did the defendant again raise a request to proceed *pro se* until after his trial.

¶ 46    One year later, on May 10, 2018, during a posttrial status hearing, the defendant again raised the issue of his proceeding *pro se*, stating he wished to proceed "*pro se* and on my own." At that time, the defendant was upset that trial counsel had not updated his posttrial motions. After querying defense counsel about the defendant's ability to understand the process, the court asked the defendant, "So, tell me what you want to do today." The defendant responded, "I want a new attorney, sir." The defendant then asked to speak with current counsel, and thereafter withdrew his request for new counsel, assuring the court that he indeed wished to go forward with Ms. Mattson's representation.

¶ 47    In addition to a defendant's request being knowingly and intelligently waived, a defendant's request to waive counsel and proceed *pro se* must be clear and unequivocal. *People v. Owens*, 2018 IL App (3d) 150616, ¶ 12; see also *People v. Burton*, 184 Ill. 2d 1, 21 (1998) ("It is well settled that waiver of counsel must be clear and unequivocal, not ambiguous."). "The purpose of requiring that a criminal defendant make an unequivocal request to waive counsel is to: '(1) prevent the defendant from appealing the denial of his right to self-representation or the denial of his right to counsel, and (2) prevent the defendant from manipulating or abusing the system by going back and forth between his request for counsel and his wish to proceed *pro se*.' " *People v.*

*Baez*, 241 Ill. 2d 44, 115 (2011) (quoting *People v. Mayo*, 198 Ill. 2d 530, 538 (2002)). Courts look at the overall context of the proceedings when determining if the request to proceed *pro se* is clear and unequivocal and "must determine whether the defendant truly desires to represent himself and has definitively invoked his right to self-representation." *Burton*, 184 Ill. 2d at 22.

¶ 48    "Where a defendant has invoked his right to self-representation, he is not required to continually renew the request once it is *conclusively* denied ***." (Emphasis added.) *People v. Black*, 2022 IL App (5th) 190386-U, ¶ 65. However, "[e]ven if a defendant gives some indication that he wants to proceed *pro se*, he may later acquiesce in representation by counsel. Under certain circumstances, defendant may acquiesce by vacillating or abandoning an earlier request to proceed *pro se*." *Burton*, 184 Ill. 2d at 23. "[C]ourts may look at the defendant's conduct following the defendant's request to represent himself." *Id*. at 24.

¶ 49    Here, the trial court did not conclusively deny the defendant's request. In fact, the trial court affirmatively stated it was willing to reconsider its initial denial at a future hearing if the defendant continued to desire to proceed *pro se*. However, the defendant chose not to renew his request to proceed *pro se*, even when the trial court specifically broached the issue at the following hearing held 12 days after his initial request. It was not until over a year later during a posttrial hearing that the defendant again raised the issue. At his May 10, 2018, posttrial status hearing, the defendant presented both a request to proceed *pro se* and a request that new counsel be appointed. Ultimately, he withdrew both requests and informed the court that he wished to continue with current counsel. As such, I believe the defendant's conduct clearly indicates he abandoned his initial request.

¶ 50    Moreover, at the April 20, 2017, pretrial hearing, while the defendant initially asked to proceed *pro se*, he also stated that he would "find someone else to help me that will represent me"

29

and that "I'll try to hire an attorney." He also told the court, "I would like to represent myself and have someone else." At the next hearing, although the trial court broached the subject, and gave him the opportunity to renew his *pro se* request, the defendant chose not to do so. Finally, at the posttrial hearing a year later, the defendant chose to remain represented by counsel. I believe the defendant's waffling between saying he wanted to represent himself, find someone else to represent him, hire private counsel, and have new counsel appointed, in addition to the defendant not renewing his *pro se* request until posttrial—at which time he withdrew his request—fails to rise to the level of a clear and unequivocal request to proceed *pro se*.

¶ 51    The majority maintains that the defendant's request was not unclear or equivocal, but such conclusion is undermined by the trial court's questioning of the defendant, and the defendant's responses thereto. I believe the trial court's questioning was to ensure the defendant understood the consequences of his actions and what he was waiving. "Courts must 'indulge in every reasonable presumption against waiver' of the right to counsel." *People v. Perkins*, 2018 IL App (1st) 133981, ¶ 42 (quoting *Brewer v. Williams*, 430 U.S. 387, 404 (1977)). The trial court simply indulged in every reasonable presumption against the defendant's waiver of the right to counsel. *Id.* As such, I believe the court did not err in denying defendant's request to proceed *pro se* and would affirm its finding.

¶ 52                                  II. Motion to Suppress

¶ 53                                  A. Traffic Stop Video

¶ 54    My attention now turns to my colleague's analysis of whether the defendant's traffic stop should have been suppressed due to the trial court's failure to view the recorded footage of the stop. "The trial judge must 'consider all the evidence presented in determining the matter before it,' and a reviewing court will review the record to ensure this was done." *People v. Castellano*,

30

2015 IL App (1st) 133874, ¶ 146 (quoting *People v. Mitchell*, 152 Ill. 2d 274, 322 (1992)). Here, the trial court did not view the stop footage which was entered into evidence. Thus, it could not have considered it. However, I believe the trial court's choice not to watch the video was harmless error.

¶ 55 "A 'trial court's failure to recall and consider testimony crucial to defendant's defense result[s] in a denial of defendant's due process rights.' " *Id.*; *Mitchell*, 152 Ill. 2d at 323. A court of review must consider whether the due process violation is harmless. *People v. Williams*, 2013 IL App (1st) 111116, ¶ 93. When determining whether the violation is harmless, "the test to be applied is whether it appears beyond a reasonable doubt that the error at issue did not contribute to the verdict obtained." *People v. Patterson*, 217 Ill. 2d 407, 428 (2005).

¶ 56 When the State moved to admit the recorded video footage, it stated the audio/video recording James Hoey's statements in the squad car was "just supplementing." In Trooper Jackson's response to the prosecutor's inquiry if all the questions he asked of the defendant were all questions captured on the recording, Trooper Jackson testified under oath that his testimony indeed reflected what was on the recording.

¶ 57 The defendant argues the video could have shown that Trooper Jackson appeared to have not become suspicious of the defendant and Mr. Hoey until after the dog sniff and thus could not have formed an independent, individualized suspicion before that time. He further argues that the video showed Trooper Jackson writing down information when he spoke to both the defendant and Hoey which could be inconsistent with Trooper Jackson's testimony that he forgot to write down the defendant's date of birth.

¶ 58 I have seen nothing in the video that contradicts Trooper Jackson's testimony. Even had the trial court watched the video and seen that Trooper Jackson wrote something on a pad of paper,

31

it would not have been able to determine what he wrote. If the video had shown Trooper Jackson writing down the defendant's date of birth, his testimony would have been contradicted. However, the video does not show with specificity *what* Trooper Jackson wrote; it simply showed that he wrote *something*. As the trial court could not have seen the specific information written, Trooper Jackson's testimony was not contradicted by the content of the video. Likewise, although the video may have shown Trooper Jackson's demeanor, it would have been impossible to determine his *subjective* belief at the time of the stop. The defendant has not pointed to any specific discrepancies between the officer's testimony and what was in the stop's footage. Thus, the error did not contribute to the trial court's ultimate decision and its choice not to watch the video was harmless beyond a reasonable doubt.

¶ 59                    B. Reasonable, Articulable Suspicion

¶ 60    Because the majority reversed based on the defendant's request to proceed *pro se* and determined the trial court erred when it did not watch the traffic stop video, it did not address the defendant's other contentions on appeal. Accordingly, I will address each in turn.

¶ 61    First, I believe the trial court made the appropriate finding when it ruled that the prolonging of the traffic stop was justified by Trooper Jackson's formation of a reasonable, articulable suspicion regarding the circumstances surrounding the stop. "Whether the trial court erred in denying the motion to suppress evidence is subject to a two-part standard of review: the trial court's findings of historical fact are reviewed for clear error and may be rejected only if they are against the manifest weight of the evidence, but the trial court's ultimate ruling as to whether suppression is warranted is reviewed *de novo*." *People v. Bass*, 2021 IL 125434, ¶ 21.

¶ 62    Unreasonable seizures are prohibited by the fourth amendment. U.S. Const., amend. IV. "A traffic stop is a seizure of both the driver and the passengers, analogous to a so-

called *Terry* stop." *Bass*, 2021 IL 125434, ¶ 15; see *Terry v. Ohio*, 392 U.S. 1 (1968). In determining the reasonableness of a *Terry* stop, the court must make a dual inquiry. *Id.* It must ask "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Terry*, 392 U.S. at 19-20.

¶ 63 An officer may conduct checks unrelated to the traffic stop's purpose. *People v. Sadeq*, 2018 IL App (4th) 160105, ¶ 52. However, " 'he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual.' " *Id.* (quoting *Rodriguez v. United States*, 575 U.S. 348, 355 (2015)).

¶ 64 "A dog sniff is not an ordinary incident of a traffic stop." *People v. Sanchez*, 2021 IL App (3d) 170410, ¶ 29. Nonetheless, "a dog sniff conducted during a lawful traffic stop does not trigger the fourth amendment so long as it does not prolong the duration of the stop." *Id.* (citing *Illinois v. Caballes*, 543 U.S. 405, 407-08 (2005)).

¶ 65 However, "[a] traffic stop 'may be broadened into an investigative detention *** if the officer discovers specific, articulable facts which give rise to a reasonable suspicion that the defendant has committed, or is about to commit, a crime.' " *People v. Baldwin*, 388 Ill. App. 3d 1028, 1035 (2009) (quoting *People v. Ruffin*, 315 Ill. App. 3d 744, 748 (2000)). The level of suspicion required for reasonable suspicion is less than that required by either a preponderance of the evidence or probable cause. *Kansas v. Glover*, 589 U.S. ___, ___, 140 S. Ct. 1183, 1187 (2020). Reasonable suspicion is a commonsense standard based on the factual and practical considerations of everyday life upon which reasonably prudent people act. *Id.* at ___, 140 S. Ct. at 1188. "[A] court's focus should be on the totality of the circumstances, and even potentially innocent conduct may give rise to reasonable suspicion when aggregated." *Sadeq*, 2018 IL App (4th) 160105, ¶ 94

(citing *United States v. Arvizu*, 534 U.S. 266, 273-75 (2002)). An officer is not required to accept or "rule out a suspect's innocent explanation for suspicious facts" before determining "a substantial chance of criminal activity" exists. *District of Columbia v. Wesby*, 583 U.S. ___, ___, 138 S. Ct. 577, 588 (2018).

¶ 66    The trial court conducted the motion to suppress hearing on May 2, 2017. Trooper Jackson was the only witness to testify. Trooper Jackson testified that on January 24, 2017, while he was on duty, a Jeep caught his attention because it was traveling 77 miles per hour in a 70 mile per hour speed zone. Additionally, he observed the Jeep was "extremely dirty, showing some signs of hard travel." When Trooper Jackson ran the vehicle registration, he found it was registered to a rental company, Hertz and Holdings. The registration check also revealed that three law enforcement agencies—the Moline, Rock Falls, and Normal Police Departments—made inquiries on the Jeep earlier in the day. With this information, Trooper Jackson initiated a traffic stop.

¶ 67    After effecting the traffic stop, Trooper Jackson approached the Jeep on the driver's side. As he walked up, he observed the passenger, whom he later identified as the defendant, looking over his shoulder out the back window, watching him approach. Trooper Jackson noticed there was no luggage in the back of the Jeep. Once Trooper Jackson reached the vehicle, he saw that the defendant "had his hand between the center console and the front passenger seat." He then asked both the driver and the defendant to "show their hands and keep them visible." While raised, the driver's hands "were trembling."

¶ 68    Trooper Jackson testified that the driver gave him a Mississippi identification card which identified him as James Hoey. Trooper Jackson then asked the defendant to write his name on a pad of paper, and the defendant complied. Although the defendant verbally gave Trooper Jackson his date of birth, Trooper Jackson forgot to write it down at that time.

34

¶ 69    Trooper Jackson took Mr. Hoey back to his squad car. Prior to getting into the squad car, Trooper Jackson asked Mr. Hoey if he could pat him down for weapons. Mr. Hoey agreed. While patting down Mr. Hoey, Trooper Jackson felt what seemed to be two large bulges of cash in Mr. Hoey's pockets. The currency amounted to approximately $5000. When asked how he got the money, Mr. Hoey stated the defendant's father had given him money to go to a casino where he won $2500 playing "Russian Roulette," a game the defendant had just taught him how to play. However, he could not remember the name of the defendant's father. He also stated his grandmother had given him $2500 to purchase a house.

¶ 70    While in the squad car, Trooper Jackson asked Mr. Hoey how he knew the defendant. Mr. Hoey told him the defendant was his cousin. After realizing that he had not written down the defendant's date of birth, Trooper Jackson asked Mr. Hoey if he knew whether the defendant had a driver's license. Mr. Hoey indicated that he did not know. Trooper Jackson inquired who owned the Jeep. Mr. Hoey stated he believed the vehicle belonged to the defendant. He further stated the defendant drove down to Mississippi from Chicago to pick him up the previous week so they could attend a cousin's funeral. However, they were late getting into town and missed the funeral. Mr. Hoey stated the defendant was now returning him to his home in Mississippi. Trooper Jackson also asked Mr. Hoey about there not being luggage in the vehicle. Mr. Hoey replied he had not brought any luggage. He also told Trooper Jackson that he brought only $40 with him and planned to buy clothes to attend the funeral. After a back-up officer arrived, but before Trooper Jackson issued citations to Mr. Hoey for an invalid driver's license and speeding, Trooper Jackson conducted the canine search.

¶ 71    The defendant does not dispute there was reasonable suspicion for the traffic stop, but argues Trooper Jackson improperly prolonged the traffic stop as there was no reasonable suspicion

35

separate from the traffic stop to justify a dog sniff. The State concedes the traffic stop was prolonged. However, it argues that Trooper Jackson had a reasonable suspicion apart from the purpose of the traffic stop to justify the defendant's continued detention and the subsequent dog sniff.

¶ 72    Here, although each of Mr. Hoey's explanations could be seen as innocent if taken alone, we must focus on the totality of the circumstances. *Sadeq*, 2018 IL App (4th) 160105, ¶ 94 (citing *Arvizu*, 534 U.S. at 273-75). Before the stop occurred, Trooper Jackson determined the Jeep was a rental vehicle, it had been the subject of at least three police inquiries earlier in the day and was extremely dirty and showed signs of hard travel. Once the stop occurred, the defendant turned in his seat and intently watched Trooper Jackson approach the vehicle in a manner that appeared suspicious to Trooper Jackson. Once Trooper Jackson reached the vehicle, he saw that the defendant had his hand placed between the console and the front passenger seat. While speaking to the defendant and Mr. Hoey, Mr. Hoey's hands were visibly trembling while they were raised. When Mr. Hoey was sitting in the squad car, Mr. Hoey gave Trooper Jackson a story about the defendant traveling from Chicago to Mississippi a week earlier to fetch Mr. Hoey in order to attend a funeral back in Chicago which the two never attended. He then told him the defendant was returning him to Mississippi. Because Trooper Jackson had earlier noticed there was no luggage in the vehicle, he inquired why that was the case. Mr. Hoey told Trooper Jackson he did not bring luggage which Trooper Jackson believed was inconsistent with Mr. Hoey being on an extended trip. Mr. Hoey thought the Jeep belonged to the defendant but did not know if the defendant possessed a driver's license. Mr. Hoey claimed having won half of the approximately $5000 found in his pockets at a casino playing Russian Roulette—which is not a casino game—and having received the other half from his grandmother for a house. Mr. Hoey also stated he could not

36

remember the defendant's father's name even though the defendant's father, Mr. Hoey's uncle, had given him a large sum of money to use at the casino.

¶ 73　In the end, the trial court was tasked with determining whether Trooper Jackson formed a reasonable, articulable suspicion under the totality of the circumstances that justified the prolonging of the traffic stop. I believe there were many specific and articulable facts that, when taken as an aggregate, could lead to a reasonable suspicion that a crime had occurred or was about to occur. Trooper Jackson observed the Jeep being a rental car; it was dirty and showed signs of rough travel. The defendant intently watched Trooper Jackson approach the vehicle, then he had his hands between the seat and console. Mr. Hoey's hands were shaking. Trooper Jackson noticed there was no luggage in the vehicle despite Mr. Hoey's telling him he was on an extended trip, first to Mississippi from Chicago then from Chicago to Mississippi. Mr. Hoey had a large amount of cash on him. Mr. Hoey told Trooper Jackson that he had gone to the casino and played Russian Roulette which is not a casino game. Also, although the defendant's father, presumably Mr. Hoey's uncle, had given him money to spend at the casino, Mr. Hoey could not recall the man's name. Taking the foregoing observations made by Trooper Jackson in aggregation, I do not believe the trial court's factual findings were against the manifest weight of the evidence. Therefore, I would affirm the trial court's denial of the defendant's motion to suppress.

¶ 74　　　　　　　　　III. Supreme Court Rule 431(b) Violation

¶ 75　The supreme court's decision in *People v. Zehr*, 103 Ill. 2d 472, 477 (1984), set forth what has become known as the *Zehr* principles, now codified in Illinois Supreme Court Rule 431(b) (eff. July 1, 2012).

¶ 76　Whether the trial court violated Rule 431(b) is reviewed *de novo*. *People v. Wilmington*, 2013 IL 112938, ¶ 26. The defendant has forfeited this issue because he did not object at trial and

37

did not raise the issue in a posttrial motion. A defendant must present both an objection at trial and include the alleged error in a posttrial motion to preserve a claim for review and avoid forfeiture. *People v. Thompson*, 238 Ill. 2d 598, 611 (2010). However, under certain circumstances, the plain-error rule allows the reviewing court to address unpreserved claims of error and bypass normal forfeiture principles. *Id.* at 613.

¶ 77    The plain-error doctrine applies when "(1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). The defendant asks us to review this error under the first prong of the plain-error doctrine because the evidence was closely balanced.

¶ 78    The initial step requires a determination of whether "a clear or obvious error occurred." *People v. Birge*, 2021 IL 125644, ¶ 24. Here, the State concedes an error occurred. Therefore, we move to the second step to determine whether the evidence was closely balanced.

¶ 79    "In determining whether the evidence adduced at trial was close, a reviewing court must evaluate the totality of the evidence and conduct a qualitative, commonsense assessment of it within the context of the case." *People v. Sebby*, 2017 IL 119445, ¶ 53. Evidence may be closely balanced where a case turns on a credibility contest between conflicting testimony. *People v. Naylor*, 229 Ill. 2d 584, 606-08 (2008). Where one party's account is unrefuted, implausible, or corroborated by other evidence, no credibility contest exists. *People v. Scott*, 2020 IL App (1st) 180200, ¶ 51.

¶ 80    At trial, Jane Troutman testified for the State. Her testimony indicated that the defendant instigated and paid for the Jeep's rental under Ms. Troutman's name. When it was time to renew the rental, the defendant would come and take her to renew the rental. She did not drive the Jeep, was not in the Jeep alone, and did not see anyone other than the defendant drive it. She denied knowing about the drugs and, while she acknowledged that her boyfriend had a prior drug conviction, she was adamant that he had never been in the Jeep and the drugs were not his.

¶ 81    When Trooper Jackson subsequently searched the vehicle, he found a food bag on the back floorboard, partially under the driver's seat. This bag lay 12-18 inches from where the defendant's hand was seen when Trooper Jackson approached the vehicle. The bag contained four individual baggies and each of these baggies contained what Trooper Jackson suspected to be a controlled substance. Upon searching Mr. Hoey, he located two large wads of cash in Mr. Hoey's pockets, rolled up and secured with rubber bands. The money totaled approximately $5000. Trooper Jackson also found a large amount of cash on the defendant, which consisted of 47 $100 bills, 6 $50 bills, and 61 $20 bills which totaled over $6000. According to Special Agent Cowell's testimony at trial, most drug dealers will carry large amounts of cash on their person in denominations of $100 bills, $20 bills, and $10 bills while typical users have smaller amounts of currency in smaller denominations. The substance in one of the baggies weighed 27.8 grams while that in a second baggie weighed 4.9 grams. Both tested positive for cocaine. Special Agent Cowell testified that 30 grams of cocaine is considered a dealer amount while the typical user amount is approximately one or two grams. Special Agent Cowell also testified that dealers often package illicit drugs in baggies like those found in the Jeep. He averred that dealers often utilize rental vehicles to avoid having their personal vehicles seized.

¶ 82    The defendant's sole witness was Paige Livingston. She was the defendant's girlfriend with whom he lived for two years and with whom he had a child. She testified that the defendant always kept all his money, which was "thousands" of dollars, in his pocket. The defendant used to keep his earnings at home but began carrying it with him because he felt that Ms. Livingston spent it all otherwise. Although the defendant used to keep his earnings at home, she did not know how much he earned. She did not know the name of the company for which the defendant worked and did not know what kind of vehicle he drove for work. She saw the defendant leave their residence, alone, in the Jeep right before his arrest. Ms. Livingston did not know to whom the Jeep belonged as neither she nor the defendant owned a car at the time. She also did not know where he was going or with whom he would be. Ms. Livingston did not know Ms. Troutman before the defendant's arrest but went to her residence at the defendant's request afterward. Although the defendant gave her directions to Ms. Troutman's home, he did not give her the address in Rockford, a large city. While Ms. Troutman told her that the drugs belonged to Ms. Troutman's boyfriend and gave Ms. Livingston her telephone number, Ms. Troutman also would not talk to her except to say that she had bills to pay.

¶ 83    Taking a qualitative, commonsense assessment of the totality of the evidence, the evidence was not so closely balanced that the error alone threatened to tip the scales of justice against the defendant. Here, I believe the State's evidence was overwhelming. The State's evidence showed the defendant controlled the car in which the drugs were found. Ms. Livingston's testimony supported this evidence. It also showed the defendant had a significant amount of cash on his person at the time of his arrest. The State also showed that one having this amount of cash, storing the drugs as they were, and renting a vehicle were all common to drug dealers.

¶ 84　　Conversely, the defendant's evidence, Ms. Livingston's testimony, largely contradicted itself or was not supportive of the defendant's stance. Ms. Livingston, despite having lived with the defendant for two years and the defendant having previously kept all his money at home, did not know how much the defendant earned. In addition to not knowing how much the defendant earned, she knew very little else about his job, such as the name of the company that employed him and what type of vehicle he drove for his job. On the one hand, Ms. Livingston claimed that Ms. Troutman told her that the drugs belonged to Ms. Troutman's boyfriend, and on the other hand, she said that Ms. Troutman refused to speak to her other than to tell her she had bills to pay. Ms. Livingston had no idea why the defendant was driving the Jeep or whose Jeep it was. Finally, and notably, Ms. Livingston placed the defendant as being alone in the Jeep.

¶ 85　　Taking the evidence as a whole, I believe the evidence was not so closely balanced such that the error alone threatened to tip the scales of justice against the defendant. Thus, there was no plain error. As such, I believe the defendant's forfeiture of the issue must stand.

¶ 86　　　　　　　　　　　　　　　　IV. Sentencing

¶ 87　　The defendant argues the trial court committed plain error when it considered the aggravating factors that (1) the defendant's conduct caused or threatened to cause serious harm and (2) the defendant received compensation. The determination of whether the trial court based its decision on improper considerations is reviewed *de novo*. *People v. Bowen*, 2015 IL App (1st) 132046, ¶ 49. The defendant has forfeited this issue because he failed to raise it in the trial court. However, under specific circumstances, the plain-error doctrine, which is "a narrow and limited exception," allows the reviewing court to address unpreserved claims of error. *People v. Hillier*, 237 Ill. 2d 539, 545 (2010).

¶ 88    To secure relief under this exception, "a defendant must first show that a clear or obvious error occurred." *Id.* "In the sentencing context, a defendant must then show either that (1) the evidence at the sentencing hearing was closely balanced, or (2) the error was so egregious as to deny the defendant a fair sentencing hearing." *Id.* The defendant asks us to review this error under the second prong of the plain-error doctrine.

¶ 89    On June 23, 2017, the trial court conducted the sentencing hearing. The State asked the trial court to consider in aggravation that: (1) the defendant's conduct caused or threatened serious harm; (2) the defendant received compensation for committing the offense; (3) the defendant had a history of prior delinquency or criminal activity; (4) the sentence was necessary to deter others from committing the same crime; and (5) the defendant was convicted of a felony committed while he was serving a period of probation, conditional discharge, or mandatory supervised release for a prior felony. Defense counsel asked the court to consider in mitigation that (1) the defendant's conduct neither caused nor threatened serious physical harm to another and (2) at the time of the offense, the defendant was suffering from a serious mental illness which, although insufficient to establish the defense of insanity, substantially affected his ability to understand the nature of his acts or to conform his conduct to the requirements of the law.

¶ 90    The State requested a sentence of 20 years' imprisonment in the Illinois Department of Corrections (IDOC). Defense counsel requested no more than a six-year sentence of imprisonment in IDOC.

¶ 91    In rendering its decision, the trial court stated it considered the trial evidence, the presentence investigation report as amended (PSI), the fact the defendant was serving a term of probation for a felony offense at the time of the commission of the current crime, the defendant's metal health-related issues, and the financial impact of a term of incarceration.

¶ 92   The trial court continued:

"Whether or not the defendant's conduct caused or threatened serious harm, the court does accept and acknowledge the arguments that are made *** [and] the court does accept and agree with the State's argument that the dealing in narcotics is and does cause a threat and threatens a serious harm to our society ***."

¶ 93   The trial court then stated, "You have been compensated for this offense that was an aggravating factor." The trial court resumed:

"You do have a history of criminality, an extensive history of criminality, extensive felony history in the last 12 years, and each and every *** result was to the Department of Corrections except *** Winnebago County placing you on probation for an aggravated battery. *** [I]t is another felony conviction and within a very short time before you were arrested and charged with these offenses in our fair county. So you do have an extensive history of criminality.

I do believe a sentence is necessary to deter others, and this was a crime that was committed while you were on felony probation ***. *** [I]t appears you were on probation, but to the extent that that is the circumstance that is one of the lesser as far as I am concerned aggravating factors. ***

*** I do not believe you are anywhere close to the minimum level of sentencing with regard to your history and I agree with the State to sentence you to 6 or 7 years of incarceration in the Department of Corrections would absolutely not only deprecate the seriousness of this offense, but also your prior history and your conduct and a strong message needs to be sent to you and others that grow up in your community ***."

¶ 94   The trial court then addressed the factors in mitigation. It stated:

43

"There is some issue with regard to your background and history, and with regard to your mental limitations ***. There is some information presented with regard to some intellectual disabilities and some mental illness issues and the court is taking that seriously and taking that into consideration with the sentence that I am going to impose because I think they are significant mitigating factors."

¶ 95     The trial court ultimately sentenced the defendant to 15 years' imprisonment in IDOC followed by 3 years of mandatory supervised release. The defendant subsequently filed a *pro se* motion to reconsider sentence. Defense counsel then filed an amended motion to reconsider sentence and attached medical records. After hearing the motion, the trial court reduced the defendant's sentence by 2 years, to 13 years' imprisonment in IDOC, indicating that it considered the supplemental information to mitigate some of the evidence regarding his behavior in pretrial custody.

¶ 96     When sentencing a defendant, the court cannot consider as a factor in aggravation a factor which is inherent in the offense for which a defendant is being sentenced. *People v. Brown*, 2019 IL App (5th) 160329, ¶ 18. Whether a trial court based a sentence on improper considerations is reviewed *de novo*. *People v. Solis*, 2019 IL App (4th) 170084, ¶ 26.

¶ 97     The aggravating factor that the defendant's conduct caused or threatened to cause serious harm cannot be considered as an aggravating factor "precisely because the issue of widespread harm from the use of cocaine is implicit in the crime of delivery. It is reasonable to conclude that the legislature weighed this implicit element of harm from the offense when it classified the crime ***." *People v. Maxwell*, 167 Ill. App. 3d 849, 852 (1988). The aggravating factor of the receipt or expectation of compensation is inherent in the crime of possession with intent to deliver, and it

is generally improper to consider it as a factor in aggravation at sentencing. *People v. McCain*, 248 Ill. App. 3d 844, 851 (1993).

¶ 98    "[I]f a trial judge states on the record that the judge is considering a certain factor and specifically mentions the factor when meting out the sentence, a reviewing court cannot presume the factor did not play a role in the sentence." *Brown*, 2019 IL App (5th) 160329, ¶ 19. Here, the trial court stated that it considered both serious harm and compensation when handing down the defendant's sentence. Thus, an error occurred.

¶ 99    When a trial court relies on an improper factor when sentencing a defendant, remandment is not always necessary. *People v. Bourke*, 96 Ill. 2d 327, 332 (1983). Rather, "a sentence based on an improper factor may be affirmed where the reviewing court can determine from the record that the weight the trial judge placed on the improperly considered factor in aggravation 'was so insignificant it resulted in no increase in the defendant's sentence. " *Brown*, 2019 IL App (5th) 160329, ¶ 19 (quoting *People v. Whitney*, 297 Ill. App. 3d 965, 971 (1998)). "The fact that the defendant's sentence was substantially lower than the maximum authorized sentence is an important consideration in determining whether the aggravating factor was given significant weight." *People v. Hileman*, 2020 IL App (5th) 170481, ¶ 51.

¶ 100   In this case, in addition to the improper aggravating factors, the trial court stated a plethora of other factors it considered. It considered the defendant's lengthy felony criminal history (numerous IDOC sentences over a 12-year time period), the need for deterrence, the evidence at trial, the PSI, the financial impact of incarceration, and the defendant's being on probation at the time the current offense was committed. Moreover, the defendant's 13-year sentence of incarceration was substantially lower than the maximum authorized sentence of 30 years. In this case, taking the record as a whole, I do not believe the trial court placed such significant weight

on the improper factors that it led to a greater sentence and the defendant was not deprived of a fair sentencing hearing. Thus, no plain error occurred and the forfeiture should stand. I believe the trial court should be affirmed on this issue.

¶ 101   For all the foregoing reasons, I respectfully dissent.